JOSEPH MASSARI, CONNIE MASSARI, VITO MASSARI AND MARY MASSARI, A CO-PARTNERSHIP DOING BUSINESS UNDER THE NAME OF MASSARI BROTHERS MACHINE CO., PLAINTIFFS-APPELLANTS, v. ACCURATE BUSHING COMPANY, A CORPORATION, DEFENDANT-REPONDENT.

Argued November 19, 1951—Decided December 10, 1951.

302

*Mr. Arthur L. Abrams* argued the cause for appellants.

*Mr. Joseph Weintraub* argued the cause for respondent (*Messrs. McGlynn, Weintraub & Stein,* attorneys).

The opinion of the court was delivered by

WACHENFELD, J. This case comes to us from the Superior Court, Law Division, by an appeal certified on our own motion. It concerns the sale by the plaintiffs to the defendant of a large quantity of drill jig bushings, and the conflicting claims and counterclaims growing out of that transaction.

The factual situation is complex and covers a period of several years. In 1946, one Einsiedler, now president of the Accurate Bushing Company, bought all of the plaintiffs' business, including machines, machine tools, trade names, raw materials and unfinished inventories, but excepting the real estate and the finished bushings. He agreed at the same time to create the defendant corporation which would buy the real estate and the finished inventory.

This subsequently was accomplished and by separate agreement, made on September 25, 1946, the plaintiffs agreed to sell to the defendant their entire finished inventory of bushings. It is from this contract the present controversy arises. Other phases of the transaction have previously been litigated. *Massari v. Einsiedler,* 6 *N. J.* 303 (1951).

The contract covered upwards of 218,000 bushings in 3,600 assorted sizes and recited:

"2. The Purchaser hereby agrees to purchase the aforesaid finished bushings, as set forth in the schedule annexed hereto and aforementioned, for the price set forth in said schedule, being the cost price to the Sellers of said bushings, and promises and agrees to purchase all of said bushings within the termination of two years from the date hereof, it being further agreed that the purchaser may purchase bushings in any quantities at any time during said period."

It contained no express warranty by the plaintiffs other than that of title and possession. The defendant suggests an express warranty might be spelled out by an examination of "Schedule A" which is referred to in the contract as a description of the inventory to be sold and which in turn refers, by symbol numbers, to the plaintiffs' catalog which contained dimensional standards and specifications established by the American Standards Association and adopted generally throughout the industry. Neither the plaintiffs' nor the defendant's appendix, however, contains "Schedule A" or pertinent excerpts from the catalog and they are not before us, although they were alluded to and apparently in the possession of counsel on oral argument.

The total purchase price to be paid over the two-year period, as detailed in Schedule B, attached to and incorporated by reference into the contract, was $45,404.50, representing the cost to the sellers, although the appraised price, as determined by an independent appraiser engaged by the plaintiffs was $172,368.09. Paragraph 5 of the contract, apparently in explanation of the price discrepancy, sets out:

"The Purchaser understands that the price offered by the Sellers for the bushings which are the subject of this agreement is made only by reason of the fact that a substantial part of the bushings are of not readily saleable and obsolete sizes, and that the purchase of all of the bushings, the subject of this agreement, is of the essence hereof."

The time for payment was set forth in paragraph 3 as follows:

"The Purchaser hereby agrees that upon the purchase of any such bushings during the aforesaid term of two years, it shall make

payment for such bushings as are delivered, within thirty days from the date of delivery, in the due course of business."

The defendant was to have the right to buy the bushings in any desired quantity at any time during the term and agreed, in all events, to complete the purchase of the entire inventory within two years from the date of the contract. Meanwhile, the plaintiffs had the right to continue the storage of the unsold portion, without cost, in the plant which had been purchased from them by the defendant.

The terms "purchase" and "delivery" as used in paragraphs 2 and 3 are not specifically defined in the contract, and the problem is further complicated by the fact there was no no physical act of delivery required since the entire stock of finished bushings remained in the plant taken over by the defendant. It is apparent from the record, however, that when the defendant resold bushings "in substantial quantities," it had the right to draw upon the inventory to fill those orders and such withdrawals constituted a "delivery" to and "purchase" by the defendant obligating it to pay the plaintiffs, within 30 days, for the quantities withdrawn according to the scale of prices set forth in Schedule B.

Between the date of the contract and September 25, 1948, the defendant resold, to its customers, approximately 144,000 of the bushings and paid the plaintiffs $26,124.85 of the purchase price. On the termination date, however, it refused to pay the balance of $19,279.65 but later sent its check for $10,099.40, saying:

"We do not feel that we are, at present, obligated to pay more owing to the fact that it is not possible for us to determine at this time, the total number of defective bushings involved in this transaction."

The plaintiffs rejected the check and, on the same day, October 5, 1948, instituted this action for the balance due on the contract. The defendant counterclaimed alleging many of the bushings were defective, to the knowledge of the plaintiffs and contrary to representations made by them, resulting

in a loss of sales and profits and necessitating an expensive inspection and checking of substantial quantities of bushings, wherefor it demanded in damages $150,000.

The trial consumed about two weeks. The plaintiffs' motions for judgment on the complaint and counterclaim were denied and the case went to the jury, which returned verdicts of $10,000 for the plaintiffs and $10,000 for the defendant. The trial court denied the plaintiffs' motion for a new trial and judgment was entered in these amounts. The plaintiffs appeal.

The verdicts returned by the jury are not supported by the evidence and their amounts bear no reasonable relation to the figures actually in controversy. The defendant's president conceded on the stand the plaintiffs were entitled to an additional $11,043.17 for the good bushings. He calculated the amount due on the counterclaim at $33,625.22. No arithmetical manipulation of the figures mentioned by either side during the course of the trial will produce the result reached by the jury in its $10,000 verdicts on the claim and counterclaim. Such an outcome could only be arrived at either by total failure to consider the evidence adduced or by a compromise based upon a mistaken recollection of the facts and figures elicited during the two weeks of the trial. In either event, the verdict is so far contrary to the weight of the evidence "as irresistibly to give rise to the inference of mistake, passion, prejudice or partiality." The judgment must therefore be set aside under *Rule* 1:2–20(*a*) as amended. *Hager v. Weber*, 7 *N. J.* 201 (1951); *Bazinsky v. Conklin*, 8 *N. J.* 40 (1951); *Capone v. Norton*, 8 *N. J.* 54 (1951); *Leary v. Gledhill*, 8 *N. J.* 260 (1950); *Klein v. Millside Farms, Inc.*, 8 *N. J.* 240 (1951).

Since a retrial will probably ensue, it is appropriate to consider and dispose of the specifications for reversal advanced by the plaintiffs.

The first ground is that the court below erred in denying their motion for judgment in the amount of $19,279.65, the unpaid balance of the contract price. It is argued the defend-

ant accepted the goods within the meaning of the Sales Act and hence is liable for the contract price. *R. S.* 46:30–54 provides:

"The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have been delivered to him, and he does any act in relation to them which is inconsistent with the ownership of the seller, or when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them."

The defendant had resold about two-thirds of the bushings and retained the rest of them, refusing the terms of plaintiffs' offer in court to take them back. The date for completion of the contract and final payment was September 25, 1948, and, when the defendant refused to pay, the plaintiffs started this action on October 5. On the same day, the defendant sent its check for the lesser amount with the letter quoted above claiming an undetermined number of the bushings were defective.

Two questions are presented: first, was this letter a sufficient notice of non-acceptance by its terms; and, second, if it be deemed an adequate notice, was it made within time? The rule has been stated in *Vacuum Ash, &c., Co. v. Huylers,* 101 *N. J. L.* 147 (*E. & A.* 1924), that "to constitute an acceptance there must be an acceptance by some unequivocal act with intent to take possession of the goods as owner. This question is one of fact. It depends upon the circumstances of the particular case." The issue is a factual one for the jury.

The plaintiffs urge that, even if it be assumed the letter constituted sufficient notice of non-acceptance, which they deny, nevertheless it came too late as it was not written until more than two years after the delivery of the goods. This argument assumes the entire inventory was delivered when the contract was signed in 1946. Again we stress the difficulty encountered by reason of the unusual circumstances. The agreement provided for purchases "in any quantity, at any time" during the two-year period, with payment to be

made "within thirty days from the date of delivery." Thus, provision was made for "delivery" at some future date despite the fact the parties were cognizant, at the time the contract was signed, that the bushings were already physically present on the purchaser's premises, under another clause permitting the sellers "to store the said bushings in the plant presently occupied by the purchaser, at no extra cost" and to have "full access and opportunity, at any reasonable hour, to inspect the aforesaid bushings and records concerning said bushings."

Paragraph 6 of the contract states:

"It is further understood and agreed that, in all events, the Purchaser will purchase the balance of all bushings on hand, at the prices set forth herein, from the Sellers, on the termination of two years from the date hereof."

The proof indicates the defendant exercised its option to purchase some 144,000 of the bushings during the two-year period, leaving a balance of more than 72,000 in stock and subject to the contract on the termination date. Pursuant to paragraph 6, the defendant was required to purchase the remainder as of that day and payment would appear to have been due, as recited in paragraph 3, within 30 days thereafter.

Meanwhile, 11 days after the terminal date, the plaintiffs started suit. It is at least questionable, in view of the contractual provisions related, whether the balance of the purchase price was then due, but no such thought is advanced by the defendant and neither party has briefed nor had the opportunity of arguing it. For that reason we have no desire to foreclose either litigant by adjudicating it now. We proffer it to be determined at the trial level in the event of a retrial. If there is merit to this suggestion, it would be an additional reason for the conclusion we have reached independent of it.

Under the existing circumstances as proven by the record, whether the defendant had accepted the goods or had within a reasonable time intimated to the seller that he re-

jected them, was a question to be decided by the jury. That having been the course pursued by the court below, we see no error.

The plaintiffs' next contention is that the court below erred in denying their motion for judgment dismissing defendant's counterclaim based upon breach of warranty.

The only express warranty in the contract was one of title and possession. The plaintiffs concede there was, in addition, an implied warranty of merchantability and the court at their request so charged the jury. The question, therefore, was whether there had been a breach of that warranty and, if so, whether the defendant had given the plaintiffs adequate and timely notice of it.

One of the plaintiff partners admitted on the stand that the bushings were manufactured to the American Standards Association (ASA) specifications and that he knew, when the defendant bought the bushings, it was going to resell them on the basis of those standards. He admitted further he knew a bushing which was outside of those standards by as much as one-fourth of one-ten-thousandth of an inch was a "defective, unsalable bushing."

The defendant's president testified that when the complete inspection of the balance of the inventory was made in the summer of 1950 the inspectors were instructed to pass, as good, bushings which varied from prescribed tolerances by as much as one-half of one-ten-thousandth of an inch, and even so it was discovered that more than 36,000 bushings were defective and non-salable.

In this state of the record, there was evidence from which a jury might find there had been a breach of the warranty by the sellers.

The plaintiffs' main contention under this point, however, is that even granting such a warranty existed and was breached, the buyer did not give notice within reasonable time. They cite *R. S.* 46 :30–55, which provides:

"But if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within

a reasonable time after the buyer knows, or ought to know, of such breach, the seller shall not be liable therefor."

Again they assume delivery of the entire inventory was made in 1946 when the contract was signed and argue that any notice given, even if sufficient in its own terms, did not come within a reasonable time after the buyer knew or ought to have known of the alleged breach.

The issue as to the date of delivery has been discussed at length under the first point argued. As to when the buyer knew or should have known that defective bushings were included in the inventory, the inspection necessary to glean this knowledge was a costly and time-consuming operation as the bushings were coated with protective grease and individually wrapped in waxed paper. It entailed the unwrapping and cleaning of each item, measurement by sensitive instruments calibrated to discern variations of less than one-ten-thousandth of an inch and, finally, recoating and rewrapping. The intricacy of the undertaking involved is a factor to be weighed in determining what was the reasonable time allowed by the statute.

Sometime during the summer of 1948, prior to the termination date, the defendant's president, in a conversation with one of the plaintiffs, had informed him that some defective bushings had been found. No comprehensive inspection had yet been made by the buyers at that time and the information as to defects was received by way of a complaint from one of the defendant's customers. The president testified the plaintiffs assured him "that if anything wasn't right there would certainly be an adjustment made." The next mention of defective bushings was contained in the defendant's letter of October 5, 1948, quoted above. Thereafter the spot inspection revealed further defects and the defendant's answer and counterclaim to the plaintiffs' suit, filed on October 22, was grounded on fraud and breach of warranty. Whether this constituted sufficient notice within a reasonable time was a question for the jury to determine in the light of the particular transaction involved.

The further question arises whether the defendant was required to make a thorough inspection promptly on receipt of the goods in order to be able to assert a claim for breach of warranty when the goods subsequently proved defective or whether, on the other hand, it had a right to assume, until the contrary was shown, that delivery of the goods, which were already individually packaged for resale and shipment to the ultimate consumer, had been made in accordance with the warranty.

There appear to be no cases directly in point in this jurisdiction. In *Orange Crush v. Slacy-Merrill Fruit*, 156 *Minn.* 436, 195 *N. W.* 147 (*Sup. Ct.* 1923), the plaintiff had purchased concentrates for flavored drinks which were already packaged and bottled for resale to the retail trade. The wholesaler did not test the contents and defects were not discovered until complaints came in from its customers. The court, disposing of an issue similar to the one which arises here, said:

"\* \* \* It cannot be contemplated that a wholesaler, purchasing from a manufacturer, could or should test packages or bottles prepared for the retail trade before disposing of the same. Hence where defects become manifest only when the packages are broken or used, some time necessarily passes before knowledge thereof reaches the wholesaler. The character of the goods may also play a part in postponing the appearance of faults therein, and even the seasons of the year may delay the development of imperfections. And a purchaser in defendant's position should not be held concluded if he is inclined to overlook the failure of an occasional package, among a quantity purchased, to comply with the warranty."

Again in *Schnitzer v. Lang*, 239 *N. Y.* 1, 145 *N. E.* 65 (*Ct. of App.* 1924), a contract to sell silk was made in June, 1919. It was not until August of the following year that the first complaints were received that the colors of shirts made from the silk ran. The court, in deciding the question of timely notice, said:

"The defendants had notice that the goods were to be placed in stock and held in reserve for the fall season of 1920. This meant that there would be no opportunity to discover the defective coloring

until the shirts had been manufactured and the customers had worn them. As to imperfections so concealed, a reasonable man might not unreasonably assume that the delivery had been made in accordance with the contract."

While the general rule is no warranty will be implied where there has been an inspection of the goods by the buyer at the time of the sale, an immediate inspection is not prerequisite to asserting a warranty and maintaining an action for its breach where the circumstances are such as to make an inspection wholly impracticable. *Barnard v. Kellogg,* 77 *U. S.* 383, 19 *L. Ed.* 987 (1871).

There is testimony in the present case that an inspection of the entire inventory of some 218,000 bushings would have required nearly two years and cost about $36,000. Tending to confirm this is the proof as to the actual inspection of 72,000 units which consumed about five months and entailed an expenditure of $8,000. On this evidence a jury might have found that the time and expense of an inspection was impracticable especially in comparison to the purchase price of approximately $45,000.

The determination of all these questions with respect to the breach of an implied warranty and the sufficiency and the timeliness of the notice of the breach, depended upon the evaluation of testimony that was sometimes vague and often conflicting. In such a posture of the case there was no undisputed factual situation upon which the court could rule as a matter of law and it properly submitted the issue to the jury.

Plaintiffs next urge the court should have granted their motion to dismiss the counterclaim in so far as it was based upon fraud, citing the elements of fraud as laid down in *Kosobucki v. McGarry,* 104 *N. J. L.* 65 (*E. & A.* 1927). They assert the only suggestion of fraud is testimony by the plant superintendent that Vito Massari, one of the plaintiffs, had seven years earlier ordered him to pass bushings at final inspection which varied from ASA tolerances by a full ten-thousandth of an inch, and they argue that fraud cannot

be established by one isolated transaction so remote in time. They emphasize, moreover, that this employee and others who had full knowledge of the plaintiffs' business practices remained in the employ of the defendant after it had purchased the business and their knowledge was imputable to it; yet no complaint was made for many months after delivery of the bushings. It is also pointed out that defendant has resold about two-thirds of the inventory for $187,000 as against the contract price for the entire inventory of 45,-404.50, thus realizing a large profit on the transaction which in itself negatives the imputation of fraud on the part of the plaintiffs.

The defendant counters by stressing other testimony of the plant superintendent saying the practice of passing bushings on final inspection which were well outside ASA tolerances and were in his opinion defective, had started some seven years before but had continued as company policy and was approved by the partners at round table conferences on several succeeding occasions. He testified that he did not know of the change of ownership which took place in 1946 and did not inform the defendant's president of this company policy at that time because "I never did understand just exactly what was the transaction and how Mr. Einsiedler did fit in the picture." It was not until sometime in 1947 when a large number of complaints and rejections came in from the defendant's customers that the witness felt obliged to correct the inspection policy which he had "become inured to."

Fraud is normally a jury question to be decided on the evidence submitted. If there was sufficient proof from which the jury could find the plaintiffs knew of a large number of defective bushings in the inventory and of the practices in their plant operations which produced them and willfully misrepresented the quality and fitness of the bushings, the jury would be justified in finding fraud in the transaction. If, on the other hand, the jury found from consideration of all the evidence that there was no willful misrepresentation as to quality or fitness, then there was no fraud.

In the face of the conflicting evidence, there was, in our opinion, a disputed factual question to be decided by the jury and it would have been error for the trial court to have granted the plaintiffs' motion.

The plaintiffs next cite as error the action of the trial court admitting evidence concerning the "actual" price paid by the defendant for the inventory. The defendant sought to prove that the real price paid for the bushings was $172,368.09, the selling price listed in the appraisal made before the contract was entered into, asserting the figure of $45,404.50 was set forth in the contract at the behest of the plaintiffs in order to secure for them a tax advantage. The difference, it is said, between that figure and the "actual" price was absorbed in the prices paid by the defendant for the purchase of real estate, machinery, trade names and the other items which made up the whole transaction whereby the defendant bought out the plaintiffs' business. The "tax advantage" sought is not further explained, but the defendant's brief says the following:

"The contract contains recitals that some of the bushings are not readily salable and obsolete. Plaintiffs suggested that recital after preliminary draft. * * * The tax-wise implications are obvious. However, none of the bushings were obsolete."

If what the defendant says is so, the parties, acting in concert, deliberately falsified the statement of consideration in the contract in order to gain a tax advantage. No such admission is made by the plaintiffs but, on the other hand, they do not deny the defendant's assertion. If the latter is true, then any tax preference secured by reason of the false statement, willfully made, would have been improper and the evidence inadmissible.

The plaintiffs raised no initial objection to the introduction of evidence concerning the $172,000 figure but concurred in the court's suggestion that such evidence related to contracts other than the one under consideration. On appeal they urge that the admission of the testimony violated the parol evi-

dence rule in that it sought to vary the terms of the contract sued upon.

Normally, when a contract is complete on its face, parol evidence will not be admissible to vary its terms. While it may be admitted to show failure of consideration, *River Park Homes Corp. v. Hammond,* 120 *N. J. L.* 519 (*Sup. Ct.* 1938), affirmed 122 *N. J. L.* 466 (*E. & A.* 1939), it is inadmissible to change the nature or amount of the consideration specified in the agreement. The rule laid down in *Naumberg v. Young,* 44 *N. J. L.* 331 (*Sup. Ct.* 1882), and confirmed in the myriad cases following it, is too firmly established to admit of doubt or question.

In the present case the purchase price of the bushings was set forth in detail, specifying unit prices and quantities for each of the sizes involved in the sale in Schedule B attached to and made part of the contract. Schedule B is not in the record before us but the pretrial order lists the aggregate contract price as $45,404.50 and this figure is not disputed by either of the parties.

The defendant asserts, however, that parol evidence of the value of the bushings as specified in the appraisal, even though inadmissible to vary the price established in the contract, may be introduced to show the damages accruing to the defendant by reason of a breach of warranty, and cites *R. S.* 46:30–75(7), which provides that the measure of damages is "the difference between the value of goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty." Evidence of the appraisal price, it is said, was competent to show "the value they would have had if they had answered to the warranty."

Where a buyer and seller deal with each other in good faith, although motivated by opposing interests in so far as each is trying to secure for himself the most advantageous terms of sale, the criterion established in the Sales Act controls the admeasurement of damages in the event the goods sold are not of the quality warranted by the seller. In such a case parol evidence is admissible not to vary the

purchase price set forth in the contract but to establish the measure of the buyer's damages for the breach of warranty. The evidence, being admissible for that purpose, shall not be excluded although the objecting party in such a case may request a charge instructing the jury that the evidence is competent only for the purposes for which it was offered.

If, however, the proof shows the buyer and seller conspired together to set a false or artificial price upon the goods sold for the purpose of tax evasion, as is here suggested, then the measure of damages should be the difference between the value of the goods delivered and their price as set forth in the contract. Our courts will not consciously lend their aid to either party seeking to collect loss or profits on a transaction permeated with fraud or illegality knowingly participated in and aimed at short-changing or taking improper financial advantage of our own government.

Here the admission of parol evidence as to the alleged "actual" price paid by the defendant for the bushings was not *per se* error. If it is found that the price set forth in the contract was not the result of an honest agreement by the parties but was false or artificial, agreed upon between them for the illegal purposes intimated, then the measure of damages, in the event of a breach, would be controlled by that price and not the value they "would have had if they had answered to the warranty." Neither the legislative sanction as expressed in the statute nor judicial enforcement can be availed of by the parties to further such an illegal purpose.

The plaintiffs object to the admission of evidence concerning rejections and complaints which were not disclosed in the defendant's answers to interrogatories propounded by the plaintiffs nor encompassed by the pretrial order. The defendant admitted in the pretrial order that its claim for rejections of bushings by its customers was limited to 164 bushings which one customer refused to accept. It was permitted, however, to introduce testimony regarding numerous other complaints and the rejection of some 800 bushings. It admits on this appeal that the further rejections

could not go to prove a liquidated claim for damages based on the value of the items rejected, but contends evidence of other rejections and complaints from customers is admissible to prove breach of warranty. The evidence offered was competent for that purpose and there was no error on the part of the court below in so admitting it.

The plaintiffs suggest other errors in the admission of certain evidence but the supporting arguments have already been answered in the disposition of the major points advanced. It is urged the court below erred in several respects in its charge to the jury. All of the alleged errors in the charge relate to and are based upon the specific grounds for reversal which have already been considered and disposed of. There is no need to review them again under separate headings.

For the reasons herein recited, the judgment is reversed and the cause remanded for a new trial.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For affirmance*—None.