188 N.J. Super. 45 (1983)
455 A.2d 1143
COLUMBIA CAN CO. OF NEW JERSEY, INC., PLAINTIFF-RESPONDENT,
v.
AFRICA-MIDDLE EAST MARKETING INC., & A.M.E. INTERNATIONAL, INC., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted January 11, 1983.
Decided January 20, 1983.
*48 Before Judges MICHELS, PRESSLER and TRAUTWEIN.
Gilbert L. Nelson, for appellants.
John J. McLaughlin & Associates, for respondent (Robert E. Nies on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
Defendants Africa-Middle East Marketing, Inc., and A.M.E. International, Inc. (A.M.E.) appeal from a judgment requiring them to pay plaintiff Columbia Can Co. of New Jersey, Inc. the purchase price of goods sold and delivered. We reverse.
The facts are not in essential dispute. A.M.E. is in the business of selling to customers in the near East an acrylic lacquer thinner for thinning automobile paint. Its principal place of business is in Somerset, New Jersey. Its method of doing business is to purchase steel containers, apparently known in the trade as pails, and usually in single, five or fifty-gallon sizes. The containers are then shipped directly to an independent contractor who fills the containers with the solvent supplied by A.M.E. Immediately upon being filled and sealed, the containers are transported by A.M.E.'s shipper to a dock for overseas transportation to A.M.E.'s customers. For several years prior to the transaction in question A.M.E. had been purchasing at least a portion of its container requirements from a company owned by Russell C. Mentone. The pails supplied by Mentone had always been of what is referred to as "fresh" manufacture and had always been satisfactory.
In October 1979 Mentone apparently gave up his own business and accepted employment by plaintiff as a salesman. In December of that year he telephoned A.M.E. to offer to sell it approximately 1800 five-gallon pails. These pails had been manufactured *49 by plaintiff's supplier for another customer who had not accepted them, and in accordance with industry usage, they had been "resprayed" for sale on the general market. Because the pails had been resprayed, they were offered at an 8% discount. At the time Mentone telephoned the A.M.E. offices, defendant's president, Dr. Raja Soudah, was abroad on a business trip. The call was then taken by Soudah's secretary, to whom the foregoing information was communicated and who advised Mentone that she would attempt to communicate the offer and would let him know. She in fact returned Mentone's telephone call the following day, accepting the offer. It appears, however, that in her communication with Soudah she did not tell him the pails were resprayed.
On January 14, 1980 the pails were shipped directly from the premises of plaintiff's supplier to the premises in Princeton of Spirit Fluid, which was one of defendant's fillers. The pails, as is customary, had been prepared for shipping by being packed with their covers in place, on pallets. The pallets were then "shrouded" top and bottom with cardboard, and wire strapping was then placed around them. Several days after the delivery, on either January 19 or January 20, Soudah telephoned Mentone and asked him to redeliver the shipment from Princeton to the premises of another filler in Farmingdale, Long Island. Mentone did not have any of his own company's trucks available but undertook to arrange for that redelivery to be made by an independent trucker, one Gillespie, who had done shipping for him previously. Gillespie picked up the packaged pallets in Princeton on January 26 and took them to Farmingdale, where they were apparently rejected for lack of space. Gillespie then returned them to Princeton but, it appears, not until two days later.
Upon the rearrival of the pails in Princeton, now two weeks following the date of the original shipment, Soudah sent an A.M.E. employee to inspect the pails. It was then that Soudah first learned that there was rust on the inside of the pails, rendering them entirely useless for A.M.E.'s purposes. He then *50 immediately notified Mentone, who forthwith inspected the pails himself. It was Mentone's testimony that the pails indeed were rusty; that they had not been examined by him prior to being shipped out by his company's supplier; that he was aware of the use to which A.M.E. intended to put them, and that he was aware that their rusty condition made them wholly unfit for their intended use. It was also Mentone's testimony that the pails seemed to have sustained damage as a result of the transhipments and their intervening outdoor storage at Spirit Fluid. Although Mentone did not directly admit that the pails were rusty when shipped, he did testify that after exposure to water or interior condensation caused by exposure to extremes of weather, rust would take between 30 days and 6 months to become visible. The trial judge found as a fact at the close of the evidence, and based largely on Mentone's testimony, that the pails were defective when shipped by reason of interior rusting, and that finding is supported by the record.
Within a day or two after his discovery of the rust condition, Soudah wrote to plaintiff's president rejecting the goods. He wrote again on the following day, February 1, 1980, confirming his first letter as well as a telephone conversation in which he rejected the goods. Demanding that plaintiff remove the pails from Spirit Fluid's premises, the letter went on to state, in part, as follows:
By this letter I am confirming my discussion with you of this morning, refusing to accept the pails as these are rusty, as verified by our staff upon examination in Princeton.
Rusty pails are of no use for us as they are unfit to pack Acrylic Lacquer Thinner. Accordingly, please make arrangements to dispose of these pails as we are not responsible for the pails nor the freight charges.
An exchange of correspondence followed, including a letter from plaintiff's president to Soudah in which he did not refer to the rust condition at all but asserted only that the pails were now A.M.E.'s property.
At some point, not clearly specified by the record, Gillespie, who had not been paid his freight charges by either party, apparently exercised self-help, and without authority, permission *51 or knowledge of either party, simply picked up the pails from Spirit Fluid in order to sell them to cover his bill.
The parties having reached an impasse, plaintiff instituted this action several months later seeking recovery of the full purchase price of the pails in the amount of $4,284.40 plus interest. Defendant's answer did not assert a counterclaim. Rather, among its separate defenses was the allegation of its rejection of the goods and the claim that "they were not as warranted."
The action was tried by a judge sitting without a jury. The sole witnesses were Mentone and Soudah. Following their testimony and the admission into evidence of routine documentary proofs consisting of invoices and the like, the judge concluded that, based on the foregoing facts, defendant had actually accepted the goods and hence that plaintiff was entitled to payment. We are constrained to conclude that the judge erred in his application to these facts of the relevant provisions of the sales article of the Uniform Commercial Code, N.J.S.A. 12A:2-101 et seq.
The trial judge, in concluding that the goods had been accepted, relied on N.J.S.A. 12A:2-606(1), which provides, in the alternative, that acceptance occurs when the buyer either
(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
(b) fails to make an effective rejection (subsection (1) of 12A:2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
In finding there was an acceptance by A.M.E., it was the trial judge's reasoning that
... the goods having been in the possession of Spirit Fluid for a reasonable period of time with no inspection made by anyone on behalf of the buyer and then the goods having been trans-shipped to another packer at the date mentioned previously, unfortunately it appears to me that the law requires me to hold that the goods were accepted, that he did have a reasonable opportunity to inspect the goods and that he also performed an act inconsistent with the seller's *52 ownership, that is they were trans-shipped to Farmingdale. So that I'm constrained to hold under the Uniform Commercial Code, 12A:2-606, that the plaintiff prevails in this matter....
Thus, while it is clear that the judge held there to have been an acceptance pursuant to subsection (c), it is not clear whether he was also applying subsection (a) or subsection (b), although it appears that he was intending to apply one or the other of them.
We have difficulty with the proposition that subsection (a) could have applied to these facts since the buyer here never signified to the seller that the goods were conforming or that it would take or retain them in spite of their nonconformity. Certainly, the buyer's request that the goods be trans-shipped from Princeton to Farmingdale cannot be so construed since it was clearly known or should have been known by Mentone that the goods had not been unpacked in Princeton but were in their original packed-for-shipping condition. The trans-shipment request could hardly have implied that a satisfactory inspection had been made or that any defect was known to the buyer or had been waived by it.
It is further evident that the judge himself could not have intended to apply subsection (b). To the contrary, his findings include the express holding "that the purchaser made timely notice of rejection." Clearly, the finding of a timely rejection precluded, as a matter of logical consistency, the simultaneous finding of an acceptance.
It appears, however, that the judge opted for the ultimate holding of acceptance rather than for an ultimate holding of rejection because of his perception that the rejection, although timely, was ineffective by reason of N.J.S.A. 12A:2-604. That section, which we deem in any event to be fundamentally irrelevant to the acceptance-rejection issue with which the court was faced, provides that when delivered goods are rejected, the buyer, in general terms, is required to reship them to the seller, store them for the seller's account or resell them for the seller's account. The judge found as a fact that the buyer here had initially complied with the obligation imposed by § 604 by *53 storing them for the seller at the premises of Spirit Fluid but that it then breached that obligation by reason of the independent trucker's unauthorized self-help conduct of removing them therefrom. That conclusion was in error since if the rejection was proper and timely, the risk of loss was borne by the seller as a matter of law. N.J.S.A. 12A:2-510(1). We are thus unable to reconcile on any theoretical or practical basis the inconsistent findings made by the trial court pursuant to § 606.
We doubt, moreover, that the finding of an acceptance pursuant to § 606(1)(c) was based on a correct interpretation of that provision. New Jersey Study Comment 4 on that section explains that it is in accord with prior New Jersey case law and further notes that
It should be remembered, however, that the Code gives the buyer under certain circumstances the privilege of handling and disposing of rejected goods without deeming him to be an acceptor.
Prior New Jersey law required, moreover, that an acceptance required an unequivocal act with intent to take possession of the goods as owner. See, e.g., Massari v. Accurate Bushing Co., 8 N.J. 299, 308 (1951). It does not appear to us that the trans-shipment request by the buyer here is reasonably susceptible to interpretation as an act intended to or having the actual effect of asserting ownership over the goods. We further point out that while N.J.S.A. 12A:2-606(1)(c) has not been construed in this context in this jurisdiction, at least some authorities are of the view that a necessary precondition for its application is that the buyer attempted to reject before acting inconsistently with the seller's ownership. As was explained in White & Summers, Uniform Commercial Code (2 ed. 1980), § 8-2 at 300:
Thus we conclude that 2-606(1)(c) is designed principally, perhaps exclusively, for the case in which the buyer has attempted to reject and then has done some act with respect to the goods. Under no circumstances should an act of the buyer in ignorance of the defective nature of the goods be held "inconsistent with the seller's ownership," and we think it only rare and extraordinary that one who has not first attempted to reject should be regarded as having acted in a manner inconsistent with the seller's ownership.
*54 It is evident, therefore, that none of the alternative modes of acceptance prescribed by § 606 applies here. But even if it had, plaintiff still would not have been entitled to judgment. First, the judge did not consider whether, if there had been an acceptance, there was a consequent and valid revocation of acceptance pursuant to N.J.S.A. 12A:2-608, see, generally, Ramirez v. Autosport, 88 N.J. 277, 286 (1982). It appears to us that there was such a revocation here.
Even more significant, however, is the obvious fact that acceptance by the buyer does not inevitably result in his loss of his remedy for breach of warranty. Thus, N.J.S.A. 12A:2-607(3)(a) expressly preserves that remedy in respect of accepted goods if the buyer "within a reasonable time after he discovers or should have discovered the breach" notifies the seller thereof. That time restriction was patently met here. Thus, the buyer was clearly entitled to his remedy for breach of warranty of fitness for use in view of the court's finding that the pails were delivered in defective condition. See N.J.S.A. 12A:2-714 and 715.
It is true that defendant did not seek damages for the breach by way of counterclaim. It did, however, assert the breach by way of his separate affirmative defenses. It may, therefore, be assumed to have thereby expressed an election to seek nothing more by way of an affirmative remedy for the breach of warranty than relief from the obligation to make payment for the defective goods. It is, of course, clear that whether the breach of warranty should have been pleaded by way of counterclaim rather than by way of affirmative offense is immaterial to defendant's right to have had that allegation decided and to have been accorded appropriate relief on the basis of that decision. See R. 4:5-4, expressly providing that "If a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, on terms if the interest of justice requires, shall treat the pleading as if there had been a proper designation." It is also clear that, pursuant to N.J.S.A. 12A:2-714(2), a buyer who has accepted goods but *55 who gives timely notice to the seller of a breach of warranty which rendered the goods without effective value is not obliged to pay for them. See, also, N.J.S.A. 12A:2-717. This is particularly so here since even if the rusty pails did have some residual value, that value was not realizable by the buyer because, as we have heretofore noted, they were misappropriated by the shipper at a time when the risk of their loss was on the seller.
We note finally that the Commercial Code is not a recondite, obtuse or abstract document imposing irrational burdens upon commercial transactions. It is, rather, intended to conform to and to codify the expectations, realities and common-sense experience of the commercial community. It is contrary to sound commercial principles for this buyer under the circumstances here to have to pay this seller for the defective goods. The Code does not require such a result and neither should the courts.
Reversed and remanded for entry of judgment dismissing the complaint.