23 N.J. Super. 15 (1952)
92 A.2d 519
S.G. YOUNG, INC., A NEW YORK CORPORATION, PLAINTIFF-APPELLANT,
v.
B. & C. DISTRIBUTORS CO., A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1952.
Decided November 5, 1952.
*17 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. George W. Wolin argued the cause for the appellant.
Mr. Louis Santorf argued the cause for the respondent.
The opinion of the court was delivered by GOLDMANN, J.A.D.
The Law Division of this court granted defendant's motion for judgment in its favor made at the close of the entire case, and plaintiff appeals. A chronological statement of what took place between the parties is of more than usual significance in the determination of this appeal.
Plaintiff is a New York corporation and a wholesale distributor of television parts; defendant, a New Jersey corporation, is a supplier. On November 18, 1950 Samuel Young, president of the plaintiff company, together with Harry C. *18 King, its vice-president and sales manager, a Mr. Katz who was connected with a Brooklyn television company, and Frank P. Fleming who was a representative of the General Electric Company of New York, went to defendant's warehouse in Paterson and there saw Philip Bornstein, president of the defendant company. They were interested in purchasing a supply of resistors and, after visually examining a sampling taken from marked boxes and cartons, purchased 269,109 half-watt and single-watt units. Of these, 235,638 were "random color-coded resistors" sold at $45 per thousand, and 33,471 were "accurate color-coded resistors" sold at $55 per thousand. A resistor is a short piece of wire, three to five inches long, bare at each end and with a bakelite coating around the center, over which is painted a band of color. Various colors are used and they constitute a code indicating the electrical resistance value of the device.
Young paid for the resistors by company check and received from Bornstein an invoice at the bottom of which appeared these two statements: "Any resistors rejected will be replaced or refunded," and "Goods returned without permission will not be accepted for credit." The former was written in; the latter was part of the printed form. This invoice constituted the entire agreement between the parties for the sale and purchase of the resistors, except for the fact that plaintiff desired resistors possessing a 20% tolerance in order to meet the requirements of General Electric which had placed an order for ten million resistors with it. This tolerance meant that each resistor had to be within 20% under or over the ideal precision point of 100%. Bornstein orally agreed that all resistors would have such tolerance. Upon completion of the transaction, Young and King placed the bags and cartons of resistors in their automobile and took them back to their Schenectady plant.
It appears that the legend "Any resistors rejected will be replaced or refunded," was included in the original invoice at plaintiff's request and for its own protection, because the *19 inspection at defendant's warehouse of a limited number of resistors could not reveal the electrical qualities of the random color-coded units, or whether they would meet General Electric's specification.
At the end of November 1950 King phoned Bornstein on behalf of plaintiff and told him that some of the resistors had more than a 20% tolerance; some had a wattage other than a half- or single-watt, and still others had broken bodies, or overlapping color bands, or flashings remaining from the molding process. The entire quantity purchased was returned, but plaintiff made no demand for a refund. According to King, Bornstein suggested that Lee Electric Inc., of Leonia, N.J., which was handling much of defendant's recalibration work, could rework the resistors. The parties, together with General Electric's representative, Arthur E. Constantine, met at the Lee plant on December 6 or 7, 1950. It was agreed that Lee Electric would recalibrate the resistors to a 10% tolerance, as General Electric then required, and would replace resistors having a wrong wattage, broken bodies and those with flashings from defendant's large stock on hand at the plant. Defendant was to pay the $10 per thousand cost of this work.
At the time this oral arrangement was made, plaintiff had already shipped three cartons of resistors back to defendant. The itemized statements covering these cartons show that of the more than 55,000 resistors shipped only 660 were described by plaintiff as over the 20% tolerance. Nothing was said of any of the resistors being "imperfect" or "defective," words which become important in the light of the pleadings in this case. Defendant later sent the three cartons to Lee Electric; plaintiff shipped the balance of the November 18 order direct to that plant.
Lee began the work of recalibration and replacement soon after December 6. Constantine set up General Electric's own instruments at the Lee plant for the purpose of accurate calibration. Plaintiff had left with Lee a number of its blank invoices, with instructions that as the work was completed *20 they could deliver and ship resistors directly to the General Electric plant or its representatives. 18,240 resistors were finished on December 8 and delivered to Constantine; he receipted for them upon one of plaintiff's invoices and they were shipped to General Electric. Another 48,445 resistors were similarly completed, delivered and accepted on December 13. Between December 13 and 19, Mr. King called at the Lee plant and took with him 6,810 resistors that had been completed, and receipted for them on his own company's invoice. The entire job of recalibration was completed early in January.
In the meantime plaintiff decided that it wanted the resistors recolored and recoded, apparently because a great number of them still carried their original and improper color-code band. Negotiations with Lee Electric to do this work began on December 19, 1950. On December 21 King wrote that company authorizing a reworking of the resistors at a cost of $10 per thousand for color-coating. The resistors were to be sorted and any culls removed and replaced from defendant's stock at the Lee plant. There was an added direction that the resistors were to be checked for a 10% tolerance. Packages were to be clearly marked to avoid confusion.
On January 4 Lee replied, advising that the cost of sorting and color-coding would be $15 per thousand. This price was orally agreed upon and Lee proceeded with the work as requested by plaintiff. As resistors were completed, they were shipped C.O.D. On March 15, 1951 plaintiff telegraphed Lee Electric to discontinue work under the contract. The next day Lee wrote plaintiff stating that it had discontinued the color-coding of the resistors. Enclosed in the letter was an invoice covering both the units already colored at the time the telegram was received as well as an additional quantity from which the color bands had been removed.
There were two shipments of resistors en route to plaintiff at the time. Plaintiff received them about March 20 and *21 26, respectively, and issued its check for each shipment. Payment on these checks was stopped immediately after, plaintiff advising Lee by letter dated March 29 that the merchandise shipped had proved unsatisfactory on inspection, and that "Some of the resistors were not even color-coated and others that were color-coated do not meet our specifications. The work that was done is very unsatisfactory." Lee's response took the form of an action at law begun in the Supreme Court of New York County, demanding $1,018.75 for work performed for the Young company. The third paragraph of this complaint recites that the work was done "at the special instance and request of the defendant [S.G. Young, Inc.]." Plaintiff was served on April 6.
Six days later plaintiff had its attorney write defendant about the resistors purchased from it back in November 1950. The letter read, in part:
"Your invoice provides that `any resistors rejected will be replaced or refunded.'
On behalf of my client, I am now requesting that you permit the return of this merchandise, which has been rejected, and that you give my client credit for the full amount thereof."
On April 16 we find plaintiff writing to the attorney for Lee Electric about the New York action, stating:
"* * * Lee Electric had agreed to color code a lot of resistors for our company of which on the first batch we stated to them that the workmanship was of inferior quality and that the color although applied to the body of the resistor still did not conform to standard appearances. We paid several C.O.D. charges to your client for this poor work.
Upon receipt of the last two shipments we cancelled payment on our checks as a protest to the poor workmanship that they want us to pay for. We are very confident that the exhibit of work performed by your client could not possibly stand up in any court in the land. We are, however, willing to have them rework at their own expense the work we refused to pay for. The resistors as they are now, are of no value to us, therefore, we hope we have explained our action in stopping payment of the two checks."
*22 Apparently nothing came of the suggestion contained in the last paragraph just quoted, for on April 26 the Young company filed a counterclaim, duly verified by its president, against Lee Electric in the New York action. The fourth paragraph reads:
"That during the latter part of December, 1950, defendant entered into an oral agreement with the plaintiff, wherein and whereby the plaintiff agreed to perform certain work, labor and services on certain resistors, owned by the defendant and the defendant agreed to pay the plaintiff therefor, at the rate of Fifteen ($15.00) Dollars per thousand."
The Young company claimed that the work had been done in an unsatisfactory and unworkmanlike manner, thereby rendering the resistors "valueless"; that Young had paid Lee $1,313.25 for this work; and that it demanded judgment dismissing the complaint and for the sum so paid.
Following all this, plaintiff instituted its present action against defendant in the Law Division on May 23, 1951, based upon the sale of the resistors under the November 1950 invoice. The complaint recites (italics ours) that "All the resistors were found defective"; that plaintiff "attempted to return the defective materials to the defendant, and did return said materials, with a demand for refund" of the $12,444.61 paid for them, but that "said demand was refused and the materials were returned to the plaintiff." Judgment in the amount of $12,444.61 was demanded, with interest and costs.
Defendant's answer sets up various defenses, the most important being plaintiff's failure to act within a reasonable time in rejecting any resistors; its waiver of the right to reject any resistors; its voluntary abandonment or surrender of such right; and its exercise of dominion and control over the resistors, so that they were altered in a substantial manner, such act amounting to a waiver of any right to reject the materials.
The pretrial order entered November 10, 1951 is significant. It recites that "Plaintiff alleges that all of the said *23 resistors were imperfect and rejected, and therefore seeks to recover the full amount of the purchase price, together with interest." (Italics ours.) The order sets out the several defenses in greater detail than the answer itself.
At the trial defendant moved for judgment of dismissal at the close of plaintiff's case. The court reserved decision. At the close of the entire case the court granted defendant's motion for judgment in its favor. It held: (1) in light of the complaint and the pretrial order setting forth plaintiff's cause of action there was a complete lack of competent evidence that the resistors were found to be defective or imperfect; (2) there was a complete lack of evidence that the resistors had been returned to defendant, and (3) plaintiff waived or lost its right to return the merchandise by altering it through recoloring and recoding so that, by its own evidence, it was valueless. The court held there was no disputed question of fact which required the case to go to the jury.
Giving plaintiff the benefit of whatever testimony there is which supports its view, the judgment below must be affirmed. There is nothing in the case to show that plaintiff at any time after December 19, 1950  to use the latest date possible upon the record  rejected the resistors or asked that they be replaced or the price paid refunded, until it wrote its letter of April 12, 1951. In so stating we accept as true the testimony of plaintiff's president, Young, and its vice-president, King, that plaintiff rejected the resistors and demanded a refund on or before December 19, 1950. King testified that the merchandise was rejected about November 28, but no refund was asked; that it was agreed with defendant on December 6 or 7 that Lee Electric recalibrate the resistors to 10% tolerance at defendant's expense; and that after the resistors had been reworked they were rejected and a refund asked on December 19. Young testified to the late-November rejection but adds that a refund was then demanded, contrary to King's testimony; he *24 also testified as to the second rejection and demand for a refund in December.
It is questionable whether there was ever anything more than a return of the resistors to defendant at the close of November, followed by plaintiff's agreement to have the material recalibrated and certain units replaced at the Lee plant, beginning December 6 or 7. Be that as it may, plaintiff was willing to hold on to the resistors which it so badly needed for the General Electric order. Certainly there was nothing in writing up to December 7, or in fact until April 12, 1950, indicating rejection of the goods because imperfect or defective. It might well be argued that plaintiff's act in agreeing on December 6 or 7 to having the resistors recalibrated to 10%, with replacements for units that were broken, wrong-wattage and the like, amounted to a confirmation of the contract of purchase.
But giving full value to the testimony of the two officers, the fact remains that after Lee's recalibration and replacement work plaintiff admittedly entered into an independent contract of its own with Lee to have the resistors recolored and recoded at $15 per thousand. Its letter of December 21, 1950, Lee's letter of January 4, 1951 calling attention to the correct price, and the subsequent course of events, fully establish that plaintiff dealt with the resistors as its own property from December 19 on. Not a word was said to defendant about imperfect or defective resistors, or about rejection, replacement or refund, between January 4 and March 15, when plaintiff stopped the work of recoloring and recoding under its contract with Lee. The same is true for the period continuing beyond March 15 to April 12.
That plaintiff confirmed the original purchase from defendant and considered the resistors as its own property is confirmed in several ways. It accepted and paid for all recolored and recoded resistors shipped C.O.D. by Lee after January 4, 1951. After Lee had instituted suit in New York against it, plaintiff on April 16 wrote complaining of the work done on its resistors, but agreed even then to *25 accept them if Lee would rework them at their own expense. On April 26 plaintiff, in its counterclaim in the New York action, spoke of the oral agreement it had with Lee whereby Lee was to do certain work on resistors "owned" by Young.
Plaintiff's letter of April 12, 1951, in which it requested defendant to "permit the return of this merchandise, which has been rejected" and to give credit therefor, came only after it had been served in the Lee action on April 6. As of the date of that letter the market for resistors had, in the language of General Electric's acting supervisor of purchasing, whose deposition was taken and used by plaintiff, experienced "some easing up." Other testimony established that resistors could be purchased in early April for $10 to $15 per thousand. Plaintiff had paid $45 and $55 per thousand to defendant. General Electric had in the meantime cancelled its large purchase order with plaintiff. For some four months defendant had heard nothing from plaintiff, except for telephonic requests that it help expedite shipments of plaintiff's resistors from the Lee plant. Then came the letter of April 12, where rejection is mentioned for the first time. The intervening events are eloquent of the reason for plaintiff's action.
The arguments in plaintiff's brief involve essentially a single point, namely, that the evidence presented a question of fact which the court should have submitted to the jury. There was no such controverted question of fact; after December 6 or 7, 1950, and certainly after December 19, plaintiff dealt with the property as its own. It did not reject the resistors because they were defective or imperfect, nor demand replacement or a refund of the purchase price.
During the course of the trial plaintiff tried to change the entire theory of its cause of action as set forth in the complaint and in the pretrial order. After cross-examination had revealed various acts and writings of plaintiff which vitiated its original theory of rejection of the goods for cause, plaintiff sought to argue that under the invoice of November 18, 1950 it had the right, at its option, arbitrarily *26 and without cause to reject all the resistors and to demand, not a replacement, but the refund of its money. The trial court properly rejected such a theory because not encompassed by the complaint (the resistors were "defective") or the pretrial order (the resistors were "imperfect").
Plaintiff now contends that the words "Any resistors rejected will be replaced or refunded," found in the original invoice, are ambiguous. At the trial its counsel expressly stated that this legend was not ambiguous and spoke for itself. But if it were ambiguous  and we in no way agree that it is  it must be construed most strongly against plaintiff at whose instance the language was inserted in the invoice. Fletcher v. Interstate Chemical Co., 94 N.J.L. 332 (Sup. Ct. 1920), affirmed 95 N.J.L. 543 (E. & A. 1921). It has many times been held that the court will not make a different or better contract than the parties themselves have seen fit to enter into. When a contract is clear, the court is bound to enforce the contract as it finds it. Herbert L. Farkas Co. v. N.Y. Fire Ins. Co., 5 N.J. 604 (1950). The words employed in a contract will be given their ordinary and popularly accepted meaning, in the absence of anything to show that they were used in a different sense. There is nothing in this case to show that the parties used the language they did in any other than its popular and ordinary meaning. The quoted language of the invoice means that the resistors must be rejected for a cause and not arbitrarily, and in the event of rejection the option is with defendant, first, to make a replacement, and second, if there is no replacement to refund the money paid.
Plaintiff based this action upon the fact that it found the resistors defective or imperfect. The pretrial order negatives the distorted construction plaintiff now seeks to put upon the words used. Just how fallacious plaintiff's contention is was demonstrated by the trial court in posing this question: If plaintiff could reject without cause, it could then reject perfect resistors. In such case, with what would defendant replace them? Would it replace perfect *27 ones with other perfect ones? This court will not interpret the invoice as plaintiff now wants it construed, thereby giving it an unfair or unreasonable advantage over defendant. Washington Construction Co., Inc. v. Spinella, 8 N.J. 212 (1951).
If plaintiff had found the resistors defective or imperfect it had the right to reject them and demand replacement or refund, or it could confirm the agreement of purchase, waiving its rights and treating the goods as its own. It could not do both. Had it desired to reject the goods purchased for cause, it should have acted promptly and within a reasonable time after discovering that the resistors were defective or imperfect. Instead, plaintiff considered the resistors as its own property and dealt with them as such by having certain work done on them. The attempt to reject on April 12, 1951 came too late. R.S. 46:30-54 (Uniform Sale of Goods Act, § 48) provides:
"The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have been delivered to him, and he does any act in relation to them which is inconsistent with the ownership of the seller, or when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them."
3 Williston on Sales (Rev. Ed. 1948), § 483, p. 32; Paul Gerli & Co. v. Mistletoe Silk Mills, 83 N.J.L. 7 (Sup. Ct. 1912), reversed on another ground, 87 N.J.L. 247 (E. & A. 1915); cf. Ibid. 80 N.J.L. 128, 129-130 (Sup. Ct. 1910).
Whatever right plaintiff had to reject the resistors must be considered as having been waived or abandoned. Incidentally, it may be mentioned that plaintiff never returned the resistors; they were in its possession at the time action was instituted and continued in its possession thereafter.
The contention of plaintiff that the court erroneously excluded allegedly competent testimony which would have supported its claim is without merit. Only one instance of such exclusion is cited, and in that instance the exclusion *28 was proper because there was nothing to show that the resistors about which the witness wanted to testify were those of defendant. A review of other testimony proffered by plaintiff and excluded by the court shows that the exclusions were proper.
The judgment is affirmed.