25 A.3d 221

POMERANTZ PAPER CORPORATION, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. NEW COMMUNITY CORPORATION, NEW COMMUNITY HOMES ASSOCIATION, LTD., NEW COMMUNITY SENIOR CITIZEN HOUSING CORP., NEW COMMUNITY HOUSING DEVELOPMENT, INC., NEW COMMUNITY ROSEVILLE CORP., NEW COMMUNITY MANOR HOUSING CORP., NEW COMMUNITY COMMONS HOUSING CORP., NEW COMMUNITY HARMONY HOUSE CORP., AND NEW COMMUNITY WORKFORCE DEVELOPMENT CENTER, DEFENDANTS–RESPONDENTS AND CROSS–APPELLANTS.

Argued May 4, 2011—Decided July 25, 2011.

*Steven I. Adler* argued the cause for appellants and cross respondents (*Cole, Schotz, Meisel, Forman & Leonard,* attorneys; *Mr. Adler* and *Jan Meyer,* of counsel; *Mr. Adler, Ms. Meyer* and *Wendy F. Klein,* on the briefs).

*Timothy K. Saia* argued the cause for respondent and cross appellant (*Morgan Melhuish Abrutyn,* attorneys).

Justice HOENS delivered the opinion of the Court.

This appeal began as a dispute between two corporations that had been doing business with each other for more than fifteen years. At the outset, it was a rather ordinary claim by one, a seller, that the other, a buyer, had failed to pay for goods and supplies that had been sold and delivered, and it therefore was commenced as a book account. The matter became far more complicated, however, when the buyer interposed a counterclaim asserting that the seller had engaged in unconscionable business practices and demanded that treble damages be awarded pursuant to the Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –20.

Following a lengthy bench trial during which the parties presented evidence about the long course of their business relationship as well as factual and expert proofs about the claims, the court issued two written opinions setting forth its findings of fact

and conclusions of law. In large measure, the trial court found that the evidence did not support the seller's claims that it had delivered goods for which it had not been paid, thus exonerating the buyer from liability on most of the breach of contract claim. However, the trial court found merit in the buyer's claims that the seller had engaged in unconscionable business practices, including "bait and switch" transactions and overcharging for goods. Based on that finding, the trial court concluded that the buyer was entitled to the benefit of, and had proven its allegations that the seller violated, the CFA.

The Appellate Division agreed with the trial court that the buyer's claim was governed by the CFA, but disagreed with the trial court's evaluation of the seller's breach of contract claim. In considering the evidence relating to the seller's cause of action, the appellate panel concluded that the trial court had misapplied the statutory requirements imposed on merchants, *see* Uniform Commercial Code (UCC), *N.J.S.A.* 12A:1–101 to :10–106, and that the court's rejection of the seller's proofs as insufficient was in error.

The parties' cross-petitions for certification raise a number of questions about the meaning and application of the CFA and about the statutory framework embodied in the UCC. The seller, for example, asserts that the Appellate Division's decision about the applicability of the CFA to commercial transactions threatens to interfere with a merchant's ordinary right to set prices. In particular, the seller contends that the appellate panel's approach will artificially limit prices that can be charged to a purchaser organized as a non-profit corporation and that the panel improperly permitted a garden variety dispute between commercial entities about reasonableness of prices to be transformed into a CFA claim. Moreover, the seller raises arguments about the proofs on which the trial court relied, asserting that the Appellate Division erred in its analysis of the sufficiency of the expert evidence that formed the essential basis for the trial court's findings of fact.

The buyer of the goods, on the other hand, asserts that the Appellate Division improperly expanded the statutory duties im-

posed on buyers by the UCC and erred by requiring purchasers to affirmatively advise a seller in writing that goods were not delivered. Furthermore, the buyer argues that the appellate court erred by failing to recognize that the question of whether a seller delivered goods is vested in the trier of fact and by failing to defer to the trial court's determination on that factual dispute.

Our consideration of this appeal rests upon an evaluation of the legal and factual issues developed in the lengthy trial and appellate proceedings. In the end, we need not address directly the question, implicit in the parties' arguments, about whether the CFA applies to transactions between merchants or whether the rights of sellers and buyers like these parties instead are limited to those established in the UCC.

Rather, we conclude that the trial court's findings that were central to its evaluation of the buyer's CFA counterclaim fail for want of sufficient credible evidence in the record and that the appellate panel erred in deferring to those findings and, by extension, in affirming the trial court's conclusions based thereon. Moreover, we conclude that the appellate panel erred in its analysis of the seller's breach of contract claim by imposing a duty of written notice of non-delivery on the buyer. Because the written notice requirement that the appellate court concluded was essential is found neither in the UCC nor in the course of dealing between the parties, the panel's evaluation of the seller's breach of contract claim cannot be sustained.

## I.

The facts that are relevant to this dispute were presented during a lengthy bench trial and the trial court's findings of fact and conclusions of law were embodied in two written opinions. Because those findings of fact and conclusions of law are at the core of the dispute on appeal, we set them forth in detail.

## A.

The record reveals that plaintiff, Pomerantz Paper Corporation, is in the business of selling paper, building, and janitorial supplies

to institutional and large-scale residential customers. Defendant New Community Corporation [1] is a federally-funded non-profit corporation that provides housing, medical, and senior services to low-income people in Essex and Hudson Counties. According to the trial court's factual findings, the course of dealing between the parties had been established over the span of some fifteen years. From 1991 through 2004, plaintiff sold defendant paper goods, janitorial supplies, and items suitable for use in its residential rental properties, all of which were purchased for and used in defendant's apartment buildings and related facilities. Those items were purchased from plaintiff based upon representations from plaintiff's Vice President that they would be sold at reasonable prices, consistent with industry standards.

The actual prices that plaintiff planned to charge were not specified in advance and were not listed on the paperwork that accompanied deliveries. Instead, the practice of the parties was that defendant would send plaintiff a printed purchase order form that would identify the description and quantity of items that were needed. That form would then be used by plaintiff's personnel to fill the order and to create a delivery slip. The delivery slips were multi-part forms that had detachable carbon copies.

Plaintiff's employees would use the delivery slip to assemble the items that defendant had ordered and, as each item was placed onto plaintiff's delivery truck, an employee would place a check mark on the delivery slip next to that item. Once the order had been assembled, the goods were often shrink-wrapped in plastic and transported on pallets to defendant's Environmental Services

---

[1] The record reflects that defendant New Community Corporation conducted its operations directly and through a large number of subsidiary corporations that were named as co-defendants in the litigation. Although some of the goods and supplies were purchased for use by the subsidiaries, the business transactions that formed the basis for this litigation were conducted between plaintiff and defendant New Community Corporation. Because the record does not reveal any distinctions between New Community Corporation and its subsidiary corporations that are relevant to our analysis, we refer to this group of corporations as "defendant."

Department parking lot. The entire shipment, which could consist of parts of multiple purchase orders, would be accompanied by the delivery slip and would be delivered by plaintiff's truck.

After a shipment of goods was delivered and unloaded from the truck, plaintiff's truck driver would have one of defendant's employees sign the delivery slip, leaving a copy with that employee. Plaintiff would then use the signed delivery slip to create an invoice, which would show a delivery date consistent with the signed slip and would list all of the items that plaintiff's delivery slip indicated had been loaded onto the truck. Defendant would not learn what prices were being charged until it received the invoice from plaintiff.

Although one of defendant's employees would sign the delivery slip, the shipment would not be unpacked until plaintiff's driver had left defendant's premises. Defendant's employees would use a copy of the delivery slip that had been left by plaintiff's driver to check what was received. Defendant's employees would then place their own check mark next to each of the items as the goods were unpacked to indicate receipt. Defendant's Director of Environmental Services testified that there were "items missing . . . on a regular basis" and that he regularly telephoned plaintiff's Vice President to alert him about items that had been ordered but had not been received. Plaintiff's Vice President conceded that he received telephone calls from defendant about items that were missing from shipments.

In 2000, defendant began to question the invoices and the prices that plaintiff was charging. From that point onward, the business relationship deteriorated, finally coming to an end in 2004 when plaintiff accused defendant of failing to pay invoices totaling approximately $700,000. That was the genesis of plaintiff's lawsuit asserting that defendant had breached its contract by failing to pay for goods sold and delivered and it eventually spawned defendant's counterclaim for CFA relief.

## B.

Based on the evidence and testimony adduced at trial, the court issued a written opinion, dated November 14, 2007, expressing its findings of fact and conclusions of law. Beginning with plaintiff's breach of contract claim, the trial court found that: (1) the parties engaged in a course of dealing pursuant to which delivery and receipt of goods could be proven by the existence of double check marks on the delivery slips; (2) plaintiff's documentary evidence offered in support of its claim that it was owed nearly $700,000 consisted largely of invoices that bore no check marks or delivery slips showing only the single check marks affixed by plaintiff's personnel; (3) many of the invoices plaintiff claimed were unpaid included charges for backordered items with no indication of delivery; (4) defendant offered credible testimony that approximately fifteen percent of all items ordered were never delivered; (5) the allegedly unpaid invoices approximated fifteen percent of all purchase orders; and (6) defendant conceded that invoices in the total amount of $15,000 had not been paid because of the parties' dispute. Utilizing those factual findings, the trial court concluded that, except for the invoices that defendant conceded it had not paid, plaintiff's proofs that defendant breached the contract failed.

Turning to the counterclaim, the trial court's findings and conclusions were largely influenced by testimony offered by defendant's expert witness. That proffer was permitted in spite of plaintiff's vigorous objections based on the timeliness and completeness of the expert's report and plaintiff's assertions that it constituted a net opinion.[2] Because the trial court believed that the expert's opinion was both admissible and persuasive, the expert's testimony formed the basis for a number of the trial court's findings. In particular, the trial court adopted the expert's

---

[2] To the extent that the substance and timing of plaintiff's objections to defendant's expert and the details of the expert's opinions are relevant to our analysis, they are detailed *infra* at 369–76, 25 A.3d at 235–39.

theory that it is customary for commercial entities that engage in transactions with non-profit corporations to utilize pricing that reflects a mark-up over the actual cost of goods that does not exceed twenty percent.

Further relying on the expert's opinion, the trial court found that plaintiff's prices did not conform with that custom and, again relying on the expert's evidence, found that the prices plaintiff charged for several specific items were excessive as compared to that benchmark. In particular, the trial court focused on evidence relating to prices charged for vacuum cleaners, locks, and cylinders for locks, finding that there was evidence about the prices that plaintiff paid for the items it sold to defendant that formed the basis for its comparison.

Finally, the trial court found that plaintiff substituted inferior goods for others that had been specifically ordered without defendant's agreement and without adjusting the price. That finding focused on orders for two items. First, the trial court found that some orders for "Delta faucets" were filled by shipping an inferior brand. Second, the trial court found that there were orders for faucets designated as "S.S.," meaning that they would be stainless steel, but that plaintiff instead shipped cheaper metal faucets that merely looked like stainless steel. Based on that evidence, the trial court found that plaintiff engaged in "bait and switch" practices. Although those sales could not be quantified, the trial court used them as examples to support the court's legal conclusion that plaintiff had violated the CFA.

In the November 2007 written opinion, the trial court used those factual findings to support its calculation of damages. On plaintiff's breach of contract claim, the trial court found that the evidence was insufficient to prove delivery because the documents included at most only the single check marks affixed by plaintiff's personnel. Nevertheless, the trial court accepted defendant's concession that invoices totaling $15,000 were due and owing. Reasoning that defendant's expert had demonstrated that all invoices included overcharges of roughly thirty percent, the trial

court relied on that opinion to reduce the amount defendant owed on the undisputed invoices and awarded plaintiff $10,500 on its breach of contract claim.

Turning to plaintiff's counterclaim, the trial court first concluded that plaintiff had violated the CFA by overcharging defendant, "by engaging in a classic bait and switch" relating to the faucets, and by substituting inferior brands. Conceding that the loss relating to the faucets, which was the basis for the "bait and switch" and substitution findings, could not be quantified, the trial court utilized the expert's thirty percent mark-up analysis to calculate the overcharges attributable to the vacuums, the locks and the lock cylinders. Based on those calculations, the trial court awarded defendant treble damages of $214,711.20. Those rulings were embodied in the trial court's November 27, 2007 Order for Judgment.

Both parties moved for reconsideration, which the trial court granted, setting forth its reasons in a February 6, 2008 letter opinion. Because defendant conceded that none of the invoices for vacuums or lock cylinders had been paid, those items could not be used in the ascertainable loss calculation as they had in the initial opinion. Instead, the trial court concluded that there was sufficient evidence in the record, again using the expert's methodology, to determine the damages based on the charges for the locks and to derive a loss figure for the substituted faucets.

In revising the calculations of defendant's CFA damages, the trial court agreed with plaintiff that the number of locks had been overstated. Recognizing as well that there was no evidence in the record about the cost of the locks, the trial court relied on the expert's opinion as to a reasonable price, which it used to determine that defendant had been overcharged. Similarly, although there was no direct evidence about the cost or the value of the faucets, the court derived damages based on prices that the expert suggested should have been charged for the lesser-quality faucets. According to the revised calculations of damages, the total amount of all overcharges was $72,180.60, which the court trebled to

$216,541.80. Thereafter, consistent with the CFA, the court awarded defendant $86,015.21 in counsel fees.

## C.

Plaintiff appealed, arguing that the trial court erred in its determination that plaintiff violated the CFA both as a matter of fact and as a matter of law. Its attack was based on a number of alternative arguments. First, plaintiff asserted that the trial court either should have barred defendant's expert testimony because service of his report was untimely or should have afforded plaintiff the opportunity to present its own expert. Second, and in the alternative, plaintiff contended that the expert's report and, by extension, his testimony constituted an impermissible net opinion that should have been excluded.

Based on those arguments, plaintiff argued that the trial court erred in concluding that its prices were unconscionable and in violation of the CFA and contended that the court's calculation of damages was flawed. Moreover, plaintiff asserted that the trial court erred in finding that the disputed invoices were based on items that were never delivered, contending that the trial court erred in its analysis of the duties imposed on the parties by the UCC.

The Appellate Division, in an unpublished opinion, affirmed as to defendant's counterclaim and reversed as to plaintiff's breach of contract claim. More particularly, the panel rejected plaintiff's attack on defendant's expert, commenting that the decision to permit the last-minute filing of the expert's report and to deny plaintiff the opportunity to rebut that proffer with its own expert did not constitute an abuse of discretion. Moreover, although recognizing that the expert's opinion "would have been more reliable" if the expert had provided a comparative basis for his opinions, the panel concluded that because the trial court heard the expert's testimony and found it to be persuasive, it was sufficient to withstand attack as a net opinion on appeal.

The Appellate Division also rejected plaintiff's argument that because defendant was a business entity it was not entitled to sue for CFA relief. In essence, the panel reasoned that the CFA protects consumers and that because defendant was "purchasing consumer products[,]" it was permitted to claim the benefit of the relief allowed by the CFA. Having reached that conclusion, the panel deferred to the trial court's factual findings and concluded that there was sufficient evidence to support the trial court's conclusion that plaintiff violated the CFA as well as its calculation of damages.

With respect to plaintiff's claim for breach of contract, however, the Appellate Division declined to defer to the trial court's reasoning. Conceding that there was sufficient evidence to support the court's findings that the absence of check marks on the documents offered in evidence indicated that the goods represented by the disputed invoices had never been delivered, the panel rejected that analysis as a matter of law. In short, the panel concluded that the UCC required defendant to alert plaintiff affirmatively and in writing that goods had not been delivered, failing which it had no viable defense to plaintiff's claim for payment. Using that analysis, the panel reversed the trial court's conclusions relating to the breach of contract claim and remanded for a calculation of the amounts owed by defendant based on the invoices.

Both parties filed petitions for certification, which we granted. 205 *N.J.* 16, 11 *A.*3d 374, 375 (2010).

## II.

Plaintiff raises several questions in its petition, which can be succinctly summarized. First, plaintiff asserts that the trial court's CFA analysis was flawed [3] and that the Appellate Division

---

[3] Plaintiff made a broader attack on the trial court's decision when appealing to the Appellate Division, arguing that the CFA does not apply at all to dealings between businesses, whether they are for profit or non-profit corporations. Although implicit in some of the arguments raised in its petition for certification,

erred in affirming that award. More specifically, plaintiff argues that, as a matter of law, nothing in the CFA limits the prices that a merchant may charge when it sells goods to a non-profit corporation. Moreover, plaintiff argues that the trial court's factual findings are not supported by the credible evidence in the record. Second, plaintiff attacks the trial court's decision to permit defendant to rely on an expert whose report was untimely without permitting plaintiff an opportunity to rebut that report, as well as the trial court's rejection of plaintiff's argument that the expert offered only an impermissible net opinion.

Defendant, in its cross-petition, argues that the Appellate Division erred in concluding, as a matter of law, that the UCC imposes an obligation on a buyer to provide written notice of non-delivery. In addition, defendant asserts that to the extent that there is any obligation concerning notice of non-delivery, it could only be derived from the parties' course of dealing, thus becoming an issue of fact as to which the appellate panel was obligated to defer to the trial court.

## III.

Although the issues have been presented to this Court as if they were entirely independent, they are intertwined, largely because of the role that defendant's expert played in the trial court's findings and conclusions. Notwithstanding the complications presented by an analysis of the issues that is necessarily overlapping, we address them in turn.

## A.

### Plaintiff's Breach of Contract Claim

The trial court rejected plaintiff's breach of contract claim except to the extent that it rested on the invoices that defendant

---

plaintiff has not directly pressed that argument before this Court and we need not consider it.

admitted were unpaid. As to that small aspect of the claim, the trial court applied a mathematical formula to reduce the sum that was due and owing. Both of those conclusions were based on a series of factual findings.

The trial court found that the parties had engaged in a course of dealing relating to placement of orders, creation of delivery slips, delivery and receipt of items that had been ordered, and invoicing. Central to that course of dealing was the parties' creation of documents to keep track of what had been ordered and, more important for this dispute, the placement of check marks, made at different times and by different people involved in the process, to identify what had been delivered. After hearing and evaluating that testimony, some of which was in conflict, the trial court found that only documents that had two sets of check marks demonstrated goods that were actually delivered and received and for which, therefore, payment was owed. Although of secondary importance, the trial court also, of necessity, found that the parties' course of dealing rested on telephonic, and not written, notice to plaintiff from defendant that items that had been ordered were missing from shipments.

In examining the evidence offered by plaintiff to prove that goods that had been ordered were in fact delivered and received, the trial court found two deficiencies. First, the vast majority of the documents on which plaintiff relied to prove delivery only bore the check marks placed there by plaintiff, and thus lacked the counterbalancing check marks evidencing defendant's receipt. Second, in evaluating the invoices on which plaintiff relied to evidence its entitlement to payment, the trial court found that numerous items for which plaintiff was demanding payment were identified as having been on backorder status, indicating that they had not yet been delivered.

Based on those factual findings, the trial court found that plaintiff failed to carry its burden of proving that the items for which payment was demanded had been delivered. That conclusion was not only based on the trial court's factual findings related

to the check marks on the invoices, but on the testimony of one of defendant's employees, which the trial court found credible, that approximately fifteen percent of all items ordered were never delivered. Reasoning in the alternative, therefore, the trial court concluded that by applying that percentage to the evidence offered about the gross amount of all orders, the disputed invoices represented approximately that percentage of non-delivered items.

There is substantial credible evidence in the record that supports the trial court's factual findings about the parties' lengthy course of dealing and, in particular, about their methods for ordering, delivering, and evidencing receipt of or failure to deliver goods. Those factual findings, along with the factual finding based thereon that the vast majority of the disputed invoices represented goods that were ordered but never delivered, are entitled to our deference. *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974). Those findings, in turn, were the basis for the trial court's conclusion that plaintiff was only entitled to recover from defendant for the few invoices as to which defendant conceded payment was due.

The Appellate Division, readily conceding that the factual determinations of the trial court were entitled to deference, instead concluded that the trial court had erred in its application of the law and reversed based on the well-recognized standard of review that gives no deference to the trial court's conclusions of law. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

In short, it was the Appellate Division's analysis of the UCC and the obligations it imposes on buyers that led it to reverse the trial court. In the panel's view, the UCC imposed upon defendant the obligation to affirmatively, and in writing, advise plaintiff about any non-delivery and, because defendant did not demonstrate that it had done so, delivery and receipt of the goods ordered was presumed and payment was due.

■ We turn, then, to a consideration of the statutory framework relevant to the dispute between the parties. The UCC fixes the obligations imposed on both buyers and sellers relating to the sale of goods, as well as their respective remedies for nonperformance by the other party. *See N.J.S.A.* 12A:2–101 to –725.

■ Pursuant to the UCC, "[t]he obligation of the seller is to transfer and deliver" the goods that are the subject of the agreement of sale. *N.J.S.A.* 12A:2–301. The obligation of the seller under the UCC does not rely on concepts of substantial performance, but instead requires that the seller make a perfect tender, meaning that the seller must tender goods that conform in all respects[4] to those specified in the parties' agreement. *N.J.S.A.* 12A:2–601 (premising buyer's remedies on "tender of delivery [that] fail[s] in any respect to conform to the contract"); *see Ramirez v. Autosport,* 88 *N.J.* 277, 285, 440 *A.*2d 1345 (1982) (observing that UCC retains perfect tender rule); 8 *Corbin on Contracts* § 33.3 (rev. ed. 1999) (describing evolution of perfect tender rule in UCC and rejection of contract law concept of substantial performance). Not only does the UCC place the obligation to tender conforming goods on the seller, *N.J.S.A.* 12A:2–503, but it also equates tender with "such performance by the tendering party as puts the other party in default if he fails to proceed in some manner[,]" *id.* at cmt. 1.

By definition, goods "conform to the contract when they are in accordance with the obligations under the contract." *N.J.S.A.* 12A:2–106(2). Moreover, as the Comments to the UCC make plain, this definition section "is in general intended to continue the policy of requiring exact performance by the seller of his obli-

---

[4] Some commentators have suggested that the UCC has softened the perfect tender requirement through its provisions relating to the seller's right to cure. *See* 8 *Corbin on Contracts* § 33.3 (rev. ed. 1999) (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* § 8–3 (5th ed.)); *N.J.S.A.* 12A:2–508. Because this dispute involves a claim that the seller failed to deliver, however, it does not rest on an analysis of the remedies available to either party based on allegations of imperfect tender.

gations as a condition to his right to require acceptance[,]" *N.J.S.A.* 12A:2–106(2) cmt. 2, and, by extension, to demand payment.

As our appellate and trial courts have concluded, because of the perfect tender rule, the degree of non-conformity alone is not relevant to the rights of the parties. *See Jakowski v. Carole Chevrolet, Inc.,* 180 *N.J.Super.* 122, 125, 433 *A.*2d 841 (App.Div. 1981) (automobile that lacked bargained-for undercoating did not conform); *Zabriskie Chevrolet, Inc. v. Smith,* 99 *N.J.Super.* 441, 445, 452–53, 240 *A.*2d 195 (Law Div.1968) (holding that new automobile with defective transmission violated perfect tender rule, thereby precluding automobile dealer from demanding acceptance and payment).

As a part of the seller's obligation to tender conforming goods to the buyer, the seller, unless otherwise bargained for, must demonstrate delivery of the goods to the buyer. *See N.J.S.A.* 12A:2–503(1) (requiring seller to "put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery"); *N.J.S.A.* 12A:2–504 cmt. 5 (explaining "seller's duty to notify the buyer of shipment" in shipment contracts). As our Appellate Division has observed, in construing the seller's obligations pursuant to the UCC, "[i]mplicit is the unconditional obligation[ ] of the seller to pass title" to goods by delivery. *Madison Indus., Inc. v. Eastman Kodak Co.,* 243 *N.J.Super.* 578, 586, 581 *A.*2d 85 (App. Div.1990) (considering whether right of first refusal constituted contract for sale of goods governed by UCC). "Of course, to recover in an action for the value of goods sold and delivered, there must be proof of delivery and acceptance." *Jaehnig & Peoples, Inc. v. Fried,* 83 *N.J.L.* 361, 362, 85 *A.* 321 (Sup.Ct.1912) (citations omitted) (concluding, in pre-UCC context, that question of whether goods had been delivered was a question of fact for the jury).

The UCC likewise obligates the buyer, following tender, "to accept and pay in accordance with the contract[,]" *N.J.S.A.* 12A:2–

301, and fixes the remedies available to a buyer when the seller has breached its obligation to deliver conforming goods, *see N.J.S.A.* 12A:2–601 (authorizing buyer to "reject the whole[,] . . . accept the whole[,] . . . or accept any commercial unit or units and reject the rest"). Finally, the UCC sets forth the right of the seller to sue for nonpayment if "the buyer has wrongfully rejected or revoked acceptance of the goods or has failed to make a payment due or has repudiated." *N.J.S.A.* 12A:2–709; *see also N.J.S.A.* 12A:2–610 (defining repudiation).

Among the rights that the UCC affords to buyers is the reasonable opportunity for an inspection of the goods that have been tendered, prior to acceptance or payment, to ensure that they conform to the contract. *N.J.S.A.* 12A:2–513; *see N.J.S.A.* 12A:2–602(1) (defining rightful rejection in terms of reasonable time after delivery or tender); *see also Massari v. Accurate Bushing Co.,* 8 *N.J.* 299, 308–13, 85 *A.*2d 260 (1951) (considering buyer's rights and timeliness of inspection under predecessor Uniform Sales Act); *S.G. Young, Inc. v. B. & C. Distribs. Co.,* 23 *N.J.Super.* 15, 27, 92 *A.*2d 519 (App.Div.1952) (addressing whether buyer's response to non-conforming tender constituted timely rejection under predecessor Uniform Sales Act).

The UCC also governs the way in which a buyer must act in order to effectively exercise its right to reject tendered goods, *see N.J.S.A.* 12A:2–602, and defines what acts or failure to act will constitute acceptance of goods, *see N.J.S.A.* 12A:2–606. The UCC regards rejection as "ineffective unless the buyer seasonably notifies the seller." *N.J.S.A.* 12A:2–602(1).

Notification, as used in the UCC, rests on whether a party has "tak[en] such steps as may be reasonably required to inform the other in [the] ordinary course whether or not the other actually comes to know of it." *N.J.S.A.* 12A:1–201(26). Moreover, the UCC explains notification in terms that give due regard for the course of dealing between the parties, observing in a related context that "[a]n organization exercises due diligence if it maintains reasonable routines for communicating significant informa-

tion to the person conducting the transaction and there is reasonable compliance with the routines." *N.J.S.A.* 12A:1–201(27).

The UCC therefore permits notification between parties to be made in accordance with their course of dealing, as long as the means and methods utilized are reasonable. Of particular relevance to this dispute, the UCC defines course of dealing to be "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *N.J.S.A.* 12A:1–205(1). More important, a course of dealing may be used to "give particular meaning to and supplement or qualify terms of an agreement." *N.J.S.A.* 12A:1–205(3).

Although there are few published decisions that illustrate these concepts, they are well-settled principles that govern the dispute before this Court on appeal. Applying them to the record requires that we first consider whether plaintiff bore its burden of proving that it was entitled to payment. That, in turn, requires that we begin with an evaluation of whether plaintiff demonstrated that it delivered the goods that were identified in the unpaid invoices. *See Lubarr v. Royal Woodwork, Inc.*, 70 *N.J.Super.* 1, 5–6, 174 *A.*2d 627 (App.Div.1961) ("Proof of such delivery was essential to plaintiff's cause of action.").

Delivery is an issue to be decided by the finder of fact, *see ibid.*, as are acceptance, *see Vacuum Ash & Soot Conveyor Co. v. Huyler's*, 101 *N.J.L.* 147, 149, 127 *A.* 203 (E. & A.1925) (holding that acceptance is question of fact for jury), and timeliness of a rejection for nonconformity, *see Fablok Mills, Inc. v. Cocker Mach. & Foundry Co.*, 125 *N.J.Super.* 251, 256–57, 310 *A.*2d 491 (App.Div.) (holding that reasonableness of two-year delay in revocation of acceptance was question for jury), *certif. denied*, 64 *N.J.* 317, 315 *A.*2d 405 (1973).

In the matter now before us on appeal, the trial court, having had ample opportunity to review the evidence and evaluate the

testimony, concluded that plaintiff's proofs fell short. That conclu-
sion was based on the court's factual findings about the double-
check system used by the parties to evidence delivery and receipt
of goods as well as the finding that the parties' course of dealing
demonstrated that they relied on oral notification that items were
missing from shipments of goods. Those findings are based on
substantial credible evidence in the record and are entitled to our
deference.

■ The Appellate Division, although recognizing its obligation
to defer to those findings, concluded that the trial court misapplied
the law. That conclusion, however, was based upon the panel's
understanding that the shipments that omitted goods entirely
were non-conforming tenders and that only a written rejection
would suffice. That is, in reversing the trial court, the panel
reasoned that the buyer is obligated to accept or reject goods and
that although the buyer is afforded a reasonable time within which
to act, it must pay for goods not affirmatively rejected. Further,
the panel concluded that the buyer is obligated both to give
notification of rejection and to establish any claimed breach relat-
ing to any goods accepted. In so concluding, the panel erred
because it equated delivery of some of the goods with a presump-
tion that the seller had delivered all of the goods [5] that were
ordered and because it imported into the UCC a requirement that
a buyer affirmatively, and in writing, reject goods that have never
been delivered as if they were tendered but non-conforming.

■ That analysis is flawed for several reasons. First, the
UCC bases the seller's rights on its obligation to demonstrate that
it made a conforming delivery, the evidence of which was lacking
in this record. Second, the UCC does not transform a seller's

---

[5] The UCC provisions relating to sales of commercial units, which permit
partial delivery and partial acceptance and rejection, *N.J.S.A.* 12A:2–601(c)
(defining right to accept some commercial units and reject the rest), do not apply
because defendants do not claim that some goods were acceptable whereas
others were not; rather, they simply claim that certain goods were never
delivered.

failure to deliver into a non-conforming delivery of goods which is accepted in its entirety, thus obligating the buyer to pay even for the non-delivered goods.

Third, even if the partial delivery of goods equated with a perfect tender of non-delivered goods that thereby triggered the buyer's obligation to affirmatively reject the non-delivered items, the appellate panel erred by imposing on the parties a single method of rejection neither required by the statute nor suggested from the course of dealing. Nothing in the statute's reference to the obligation to reject by "seasonably notif[ying] the seller," *N.J.S.A.* 12A:2–602(1), or in the definition of notification, *N.J.S.A.* 12A:2–201(26), demands that notification be in writing. On the contrary, the form of notice need only be reasonable in the context of the course of dealing between the parties.

To the extent that the course of dealing was the key, the panel erred by failing to give due deference to the trial court's findings. There is ample support in the record for the finding, implicit in the judge's written opinion, that the parties relied on oral telephone notice to communicate that some of the goods that were checked off on the delivery slip were not in fact included in the shipment. Indeed, plaintiff's representative admitted at trial that there were numerous telephone calls from defendant's representative, many of which advised that items were missing from deliveries. Through that testimony, plaintiff acknowledged both that oral communication about a failure to deliver was the accepted mode of notification and that defendant had raised numerous complaints about errors in the information otherwise to be derived from the delivery slips on which plaintiff relied for its proofs. The appellate panel therefore erred in failing to recognize that, based on the trial court's findings, plaintiff had notice of nondelivery of certain goods. *See N.J.S.A.* 12A:1–201(25)(a) (person has notice when he has "actual knowledge"); *N.J.S.A.* 12A:1–201(26)(a) (person receives notice when matter "comes to the person's attention").

There can be no doubt that a buyer is not obligated to pay for goods that have never been shipped and therefore have not been tendered. Nor can there be much doubt that a delivery of goods that does not include some of the items reflected in the purchase order is but a partial delivery and therefore a partial tender that does not impose on the buyer an obligation to pay except to the extent that the delivery is completed.

We therefore conclude that the Appellate Division erred in two ways. First, the panel's reasoning that the trial court had misapplied the law in analyzing the obligations of the parties under the UCC was in error. Second, the panel erred in failing to defer to the factual findings of the court as to the course of dealing between the parties that bore on the means of communication about errors in the delivery slips and failures to deliver items that had been included in the purchase orders. In the end, the trial court's findings of fact concerning the plaintiff's failure of proofs and its conclusions of law concerning the failure of plaintiff's breach of contract claim must be sustained.

## B.

### Defendant's Counterclaim for CFA Relief

Plaintiff's petition for certification argues that this Court should reverse the Appellate Division's judgment affirming the defendant's entitlement to damages on its CFA counterclaim. Plaintiff's argument on appeal has two components: one based on the adequacy of defendant's CFA proofs and the other relating to the technical requirements for CFA liability.

We begin our analysis with the arguments concerning the adequacy of defendant's proofs. In considering the CFA claim, the trial court based its findings almost exclusively on the opinions of defendant's expert that plaintiff has challenged both as being untimely and as representing a net opinion.

The facts that give rise to plaintiff's timeliness argument are not seriously disputed. Defendant first served its expert's report at

the close of business on the last day permitted for discovery. That report, attached to correspondence from counsel referring to an amendment to interrogatory answers, was two pages long, was not on letterhead that would reveal the author's business or professional identity, and did not refer to any recognized standards or relevant experience of the author. It was, however, accompanied by a copy of the expert's C.V. Plaintiff's motion to strike the report or to cure the asserted prejudice caused by the late delivery of the report by extending the time within which plaintiff might serve a responsive expert's report was denied.

The record reflects that plaintiff's motion to extend discovery was referred to, and denied by, the Civil Presiding Judge. Because there had been a lengthy period of time after the discovery end date during which the parties had continued to exchange information but during which plaintiff had not sought relief relating to the expert's report, the court found that plaintiff could not demonstrate exceptional circumstances as is required for an extension of discovery following fixing of a trial date. *See R.* 4:24–1(c).

At trial, it became clear that defendant's expert had only limited experience relating to the purchase of janitorial or paper supplies and only anecdotal information purporting to be relevant to contracting between for-profit suppliers and nonprofit entities. He identified no standards relevant to any of the matters in dispute, referred to no general or specific pricing guides, and offered no comparative analyses that related to any of the products that were in issue. Nonetheless, he offered opinions based on his "experience" and testified about his unsupported belief that there are industry standards governing maximum price ranges that should be charged to nonprofits. Moreover, the expert opined about what the prices should have been for items without providing or relying upon any information about what the specific products were, what prices plaintiff paid for those items, or at what price plaintiff or any other vendor listed and sold them at the time the products were sold to defendant. Nonetheless, the expert testified that the prices charged by plaintiff for some or all of the

goods it sold to defendant were excessive. As part of his testimony, the expert identified three items that he concluded were examples of instances in which plaintiff did not deliver the item that was ordered, but substituted an inferior item of lesser, albeit unquantified, value.

In general, we apply an abuse of discretion standard to decisions made by our trial courts relating to matters of discovery. *Bender v. Adelson*, 187 *N.J.* 411, 428, 901 *A.*2d 907 (2006). That is, "[w]e generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." *Rivers v. LSC P'ship*, 378 *N.J.Super.* 68, 80, 874 *A.*2d 597 (App.Div.) (citing *Payton v. N.J. Turnpike Auth.*, 148 *N.J.* 524, 559, 691 *A.*2d 321 (1997)), *certif. denied*, 185 *N.J.* 296, 884 *A.*2d 1266 (2005). As it relates to extensions of time for discovery, appellate courts, including this Court, have likewise generally applied a deferential standard in reviewing the decisions of trial courts. *See, e.g., Szalontai v. Yazbo's Sports Cafe*, 183 *N.J.* 386, 396–97, 874 *A.*2d 507 (2005); *Rivers, supra*, 378 *N.J.Super.* at 82–83, 874 *A.*2d 597. *But see Tucci v. Tropicana Casino & Resort, Inc.*, 364 *N.J.Super.* 48, 51, 834 *A.*2d 448 (App.Div.2003) (holding trial court's dismissal of complaint with prejudice due to late-filed expert report was abuse of discretion under circumstances); *Smith v. Schalk*, 360 *N.J.Super.* 337, 344–46, 823 *A.*2d 65 (App. Div.2003) (reversing trial court order permitting extension of discovery). Applying that standard, we would not, on this record, interfere with the court's decision to deny plaintiff's motion for an extension of time for preparation of an expert to counter defendant's late-filed expert report.

Nonetheless, we reach a different conclusion as it relates to the trial court's rejection of plaintiff's motion to strike the expert's report and testimony on net opinion grounds. To be sure, we apply the same deferential approach to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard. *See, e.g., Kuehn v. Pub Zone*, 364 *N.J.Su-*

*per.* 301, 319–21, 835 *A.*2d 692 (App.Div.2003) (concluding that expert had sufficient training and experience to offer opinions on security requirements relating to taverns), *certif. denied,* 178 *N.J.* 454, 841 *A.*2d 92 (2004).

Our *Rules* have fixed, clear guidelines that govern the admissibility of expert opinions and against which trial courts must make their evaluations. *See N.J.R.E.* 702, 703. Expert testimony must be offered by one who is "qualified as an expert by knowledge, skill, experience, training, or education" to offer a "scientific, technical, or ... specialized" opinion that will assist the trier of fact, *see N.J.R.E.* 702, and the opinion must be based on facts or data of the type identified by and found acceptable under *N.J.R.E.* 703.

 Of particular importance for this appeal, a court must ensure that the proffered expert does not offer a mere net opinion. *See Polzo v. Cnty. of Essex,* 196 *N.J.* 569, 583, 960 *A.*2d 375 (2008); *Buckelew v. Grossbard,* 87 *N.J.* 512, 524, 435 *A.*2d 1150 (1981). That is, an expert's bare opinion that has no support in factual evidence or similar data is a mere net opinion which is not admissible and may not be considered. *See Polzo, supra,* 196 *N.J.* at 583, 960 *A.*2d 375; *Buckelew, supra,* 87 *N.J.* at 524, 435 *A.*2d 1150; *see also State v. Townsend,* 186 *N.J.* 473, 494, 897 *A.*2d 316 (2006); *In re Yaccarino,* 117 *N.J.* 175, 196, 564 *A.*2d 1184 (1989). The admissibility rule has been aptly described as requiring that the expert "give the why and wherefore" that supports the opinion, "rather than a mere conclusion." *See Polzo, supra,* 196 *N.J.* at 583, 960 *A.*2d 375 (quoting *Townsend, supra,* 186 *N.J.* at 494, 897 *A.*2d 316); *Rosenberg v. Tavorath,* 352 *N.J.Super.* 385, 401, 800 *A.*2d 216 (App.Div.2002); *Jimenez v. GNOC, Corp.,* 286 *N.J.Super.* 533, 540, 670 *A.*2d 24 (App.Div.), *certif. denied,* 145 *N.J.* 374, 678 *A.*2d 714 (1996).

As an example, our Appellate Division has rejected a trial court's reliance on an expert's personal "rule of thumb" regarding fair market valuation as violating *Rule* 703. *Alpine Country Club v. Borough of Demarest,* 354 *N.J.Super.* 387, 395–96, 807 *A.*2d 257

(App.Div.2002) (concluding that expert's "rule of thumb" approach was neither based on any accepted methodology used by other appraisers nor referenced or adopted by authoritative texts or case law). Applying these standards, our Appellate Division has concluded that a trial court may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified. *Dawson v. Bunker Hill Plaza Assocs.,* 289 *N.J.Super.* 309, 323–25, 673 *A.*2d 847 (App.Div.) (concluding that expert opinion lacked basis in facts sufficient to be more than guess or conjecture), *certif. denied,* 146 *N.J.* 569, 683 *A.*2d 1164 (1996); *see, e.g., Suanez v. Egeland,* 353 *N.J.Super.* 191, 203, 801 *A.*2d 1186 (App.Div.2002) (concluding that trial court erred because expert demonstrated no foundation established by scholarly literature or persuasive judicial decisions).

Similarly, if an expert cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is "personal," it fails because it is a mere net opinion. As the Appellate Division has held:

> It is insufficient for . . . [an] expert simply to follow slavishly an "accepted practice" formula; there must be some evidential support offered by the expert establishing the existence of the standard. A standard which is personal to the expert is equivalent to a net opinion.
>
> [*Taylor v. DeLosso,* 319 *N.J.Super.* 174, 180, 725 *A.*2d 51 (App.Div.1999) (citations omitted).]

Comparing the opinions offered by defendant's expert with these fundamental requirements, we cannot escape the conclusion that the opinions were nothing more than the expert's personal views. Certainly the two-page summary report that the expert prepared is devoid of any clue as to its basis and lacks any suggestion about the expert's support for the conclusions that he intended to offer at trial. Looking beyond the report and considering the testimony that the expert offered during the trial, the opinions he gave were not supported by any basis sufficient to be admissible under our *Rules of Evidence. See N.J.R.E.* 703.

To be sure, the witness opined at some length about his experiences and his impressions, but his essential testimony about acceptable markups in sales to non-profit purchasers lacked any foundation of the sort required for admissibility. There is no suggestion that there are handbooks, manuals, treatises, articles or trade publications that would support the opinions about accepted profit margins for sales to non-profit entities. Nor is there any reference to price books, pricing guidelines, material manuals, or similar information that might have supported the opinions that the prices plaintiff charged for any particular product were unreasonable. There was a limited effort to make a comparison to the same or similar products offered for sale by other suppliers, but no basis on which to draw the conclusions offered that the prices were excessive or that the products were not as represented. In the end, the expert offered a series of personal views that were net opinions and therefore not worthy of consideration.

By rejecting plaintiff's motion in limine and by permitting defendant's expert witness to testify, the trial court erred. That error led the trial court to utilize the expert's flawed and unsupported views throughout its analysis of defendant's counterclaim both on liability and damages. That is, the unsupported views expressed by the expert formed the basis on which the trial court relied in making its findings that there is an accepted industry standard that governs the prices that a commercial entity may charge another corporation that operates as a non-profit. That error was compounded because it caused the trial court to overlook the unrebutted testimony from both parties that there had been no agreement as to price save a general one that prices be reasonable. Moreover, notwithstanding the absence of any assertion from defendant's principal that defendant had an expectation about mark-ups consistent with the expert's opinion, the trial court utilized the expert's net opinion to conclude that the prices were commercially unreasonable and unconscionable.

Apart from the expert's unsupported and inadmissible view about what a reasonable price might be, there is no evidence that

supports relief on defendant's counterclaim. That the evidence in support of defendant's claim is lacking is best demonstrated by the recalculations included in the trial court's revised opinion issued following the cross-motions for reconsideration. The trial court's initial opinion on the damages to be awarded on the counterclaim was based on sales of three products: the vacuums, the locks, and the lock cylinders. In the initial opinion, the trial court referred to other products, including the faucets, not to calculate damages, but to support its conclusion that plaintiff had violated the CFA by employing a "bait and switch" practice.

Following the motions for reconsideration, the trial court conceded that the calculations for the vacuums and the lock cylinders were faulty because there were no outstanding invoices for those products. As a result, the trial court recalculated its damage award by relying on two products: the faucets, which had not originally been quantified, and the locks, which had been part of the basis for the original award. In doing so, the court reasoned that defendant was entitled to relief based on the faucets because it believed that it was ordering and paying for "Delta" brand faucets and stainless steel faucets but that plaintiff substituted an inferior product.

Even so, the court's damages calculation demonstrates the lack of supporting evidence offered by the expert. Rather than calculating damages by evaluating the price for which the product that was provided should have been sold, or by comparing the price of that product with the price of the product promised, the trial court relied on the expert's percentage of markup analysis in making its calculations. The trial court's error is plain from its stated concession that the actual price paid by plaintiff for the faucets was not provided by any party; rather than recognizing that the proofs as to damages failed, the court simply relied on purely speculative impressions provided by defendant's expert. The error as to the calculation for the loss based on the locks is similarly flawed because the trial court relied on the expert's wholly speculative views about what the price should have been.

See *Polzo, supra,* 196 *N.J.* at 584, 960 *A.*2d 375 (holding that net opinion is insufficient to satisfy burden of proof); *Lane v. Oil Delivery, Inc.,* 216 *N.J.Super.* 413, 420, 524 *A.*2d 405 (App.Div. 1987) (remanding and cautioning that proof of damages must "not be a matter of speculation").

Regardless of whether, in light of the purpose and scope of the UCC, this Court would conclude that the CFA can ever apply to transactions between merchants, we need not address that question because defendant's CFA claim fails for want of sufficient evidence. That is, the practices that the trial court identified as having been CFA violations related to the items, including the faucets, as to which the claim fails for want of proof that defendant suffered an ascertainable loss. *See Bosland v. Warnock Dodge, Inc.,* 197 *N.J.* 543, 558, 964 *A.*2d 741 (2009) (requiring plaintiff prove "definite, certain and measurable loss" to succeed on CFA claim); *Thiedemann v. Mercedes–Benz USA, LLC,* 183 *N.J.* 234, 238, 872 *A.*2d 783 (2005) (holding that failure to produce evidence on which finder of fact could find or infer ascertainable loss should result in summary judgment against plaintiff in CFA claim). In similar fashion, the trial court erred in its conclusion that the prices charged for the locks were unconscionable, and therefore violated the CFA, because that reasoning was supported only by the expert's net opinion on pricing.

 We are constrained to consider one last aspect of the claims between the parties. Defendant conceded that $15,000 in invoices were due and owing. Using the expert's thirty percent analysis, the trial court reasoned that those invoices must have been overstated by that percentage. In making its findings and conclusions, therefore, the trial court concluded that the true amount owed based on defendant's concession was $10,500 and included that sum in the overall judgment. Because the expert's opinion fails as an impermissible net opinion, however, the trial court had no warrant to accept that opinion and to suppose that the concededly outstanding invoices should be reduced by that percentage.

## IV.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for entry of judgment in favor of plaintiff and against defendant in the amount of $15,000, representing unpaid invoices conceded to be due and owing, and for entry of a judgment of no cause for action on defendant's counterclaim.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO and HOENS—6.

*Opposed*—None.