**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3790-17T4

ROBERT DECOTIIS and
STEPHANIE DECOTIIS,

      Plaintiffs-Respondents,

v.

DR. HARMON STEIN, and
CAMPUS EYE GROUP &
LASER CENTER,

      Defendants,

and

DR. BRIAN COHEN,

      Defendant-Appellant.

_____

Argued September 9, 2019 – Decided September 30, 2019

Before Judges Sumners, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1139-14.

Robert Thomas Gunning argued the cause for appellant (Morrison Mahoney LLP, attorneys; Robert Thomas

Gunning, of counsel and on the briefs; Lina P. Corriston, on the brief).

Robert G. Hicks argued the cause for respondents (Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, attorneys; Robert G. Hicks, on the brief).

PER CURIAM

In this medical malpractice action, plaintiff Robert DeCotiis asserted negligence claims against defendants Brian Cohen, O.D., and Harmon Stein, M.D., arising out of complications caused by lasik eye surgery.[1] Immediately before trial, plaintiff dismissed his claims against Dr. Stein. The jury subsequently awarded plaintiff $483,500 as compensatory damages against Dr. Cohen, as the sole remaining defendant.[2] On appeal, Dr. Cohen argues that the trial court erred in denying his motions: 1) to dismiss plaintiff's lack of informed consent claim; 2) to bar the "personal opinions" of plaintiff's ophthalmology

---

[1] "Lasik is an acronym for laser assisted keratomileusis in situ." New Jersey Eye Center, P.A., v. Princeton Ins. Co., 394 N.J. Super. 557, 561 n.1 (App. Div. 2007).

[2] Plaintiff dismissed his claims against Campus Eye Group & Laser Center (Campus) by stipulation. Plaintiff's wife, Stephanie DeCotiis, voluntarily dismissed her per quod claim.

2

expert, Michael E. Sulewski, M.D.; and 3) for an involuntary dismissal, under Rule 4:37-2(b).  We affirm.

I.

Plaintiff scheduled a consultation at Campus to be evaluated for lasik eye surgery.   At that initial visit, plaintiff completed "standard medical forms," and a medical assistant "took some measurements of [his] eyes" before advising him that he was "a good patient based on the information that she had."  Plaintiff then scheduled a "pre-operative follow up" exam on April 5, 2012, and surgery with Dr. Stein for April 16, 2012, to be performed at Campus.

The April 5, 2012 pre-operative appointment was the first time that plaintiff met Dr. Cohen, a licensed optometrist.  In describing his relationship with Campus, Dr. Cohen alternatively referred to himself as an "independent optometrist," "staff optometrist," and "independent contract[or]."  He explained that one of his duties at Campus was to "collect the data for" Dr. Stein.  During the April 5 exam, Dr. Cohen measured plaintiff's pupil size at 6.5 millimeters in diameter in "mesopic conditions," which was described by Dr. Cohen to mean "dim light illumination."

According to plaintiff, he explained to Dr. Cohen that "about [ten] years prior" to his visit he had a "corneal ulcer, basically . . . a tiny hole in [his]

3

cornea," which "fully healed" and did not affect his vision, but he disclosed it to Dr. Cohen in case any residual scarring would make him a poor candidate for lasik surgery. Plaintiff "specifically remember[ed] asking Dr. Cohen if that was okay and remember[ed] him indicating to [plaintiff] that it was not going to be an issue and that [plaintiff] was a good candidate for the surgery."

After Dr. Cohen took his measurements, plaintiff received pupil-dilating eye drops, and one of Dr. Cohen's assistants measured the topography of plaintiff's corneas with a Zeiss Topographer, which measured the diameter of plaintiff's pupils at approximately eight millimeters in each eye in "scotopic" illumination, described by Dr. Sulewski during trial to mean "very, very dim" or "dark" illumination. Before the day of his lasik surgery, plaintiff received a consent form.

The consent form disclosed that individuals who have "large pupils (greater than [seven] millimeters) in dim light conditions may experience night vision difficulties such as halos around lights, glare, and ghosting." Plaintiff read the form and was "aware . . . there were certain risks including a potential for night vision problems, such as halos, starburst, and the like," but did not have any questions because he "figured that if there was anything that put [him] out of the ordinary other than [his] corneal ulcer that it would have been brought up

to [him] prior to the surgery." Thus, according to plaintiff, he did not "have any reason to think [he was] at an increased risk over any other patient" of incurring the disclosed symptoms.

Plaintiff signed the consent form on April 16, 2012, the day of his surgery. Dr. Stein testified that he has worked with Dr. Cohen for at least twenty years, and that he "rel[ies] upon" the "pre-operative testing [that] is provided to [him]." Dr. Stein did not "conduct any testing" himself, and further stated that in 2012, pupil size was "[i]rrelevant" to him because the lasers are sufficiently advanced, but acknowledged that the pupil size "has to be programmed in so the computer knows . . . how to treat the eye." Dr. Stein also compared pupil size to a patient's date of birth. In other words, the data is entered for the sake of completion.

Two months after the surgery, plaintiff became "concerned" because he was experiencing night vision issues. As plaintiff explained:

> primarily the most debilitating of the night vision issues was the starburst thing. Essentially, when I'm in a dark location any point of light that I see is spread out in all directions with like lines coming out of it. In addition to that I have double vision/ghosting in my . . . eyes. So when I look at something, instead of just seeing one copy of that, I see slightly down and to the right, another copy and slightly up and to the left, another copy. They're not as opaque as the actual object that I'm looking at but it's – it's very, it's – it's bad.

A-3790-17T4

Plaintiff visited Dr. Cohen on June 28, 2012 for a follow-up examination, and Dr. Cohen noticed there were some "wrinkles in the flap," or top layer of tissue on his eye, that was cut open and placed back down on his eye with a "sort of squeegee" at the end of the surgery. Dr. Stein thereafter "performed a flap lift procedure" that day "where he lifted the lasik flaps [and] laid . . . and squeegeed them back down." Plaintiff explained that the flap lift procedure did not help much, but Dr. Cohen provided him with a trial bottle of Alphagan, a side effect of which is to "constrict[] the pupil," which "greatly reduced [plaintiff's] night vision issues."

The next time plaintiff met with Dr. Cohen was in December 2012. Plaintiff was still experiencing night vision problems, and, according to plaintiff, at that visit Dr. Cohen "agreed with [plaintiff] that [his] pupil size may [have been] causing the night vision issues." Dr. Cohen denied ever telling plaintiff at any visit that he had large pupils.

Plaintiff's "debilitating" night vision issues continued, despite attempts by a second physician to remedy the problem. He filed suit alleging that Dr. Cohen and Dr. Stein "negligently and carelessly examine[d] and/or treat[ed] [p]laintiff so as to leave [him] with impaired vision." According to plaintiff's testimony at trial, he would not have signed the consent form, and proceeded with the lasik

surgery, if Dr. Cohen informed him that his large pupil size increased his risk of experiencing night vision complications.

Dr. Cohen filed a motion for summary judgment under Rule 4:46-2, claiming that he did not have a duty to obtain plaintiff's informed consent since he was not the operating surgeon, but instead was akin to a referring physician to whom a duty does not apply. See Herrara v. Atlantic Surgical Group, P.A., 277 N.J. Super. 260, 268-70 (Law Div. 1994). Dr. Cohen also argued that he correctly measured plaintiff's pupils in accordance with the manual for the laser machine that Dr. Stein used to perform the lasik surgery, which, according to Dr. Cohen, established the applicable standard of care.

Distinguishing Herrara, the motion judge in a comprehensive written opinion determined that Dr. Cohen "was not a referring physician or recommending physician as were the practitioners in the Herr[a]ra case . . . ." Instead, the court noted "Dr. Cohen took a variety of pre-operative measurements which determined whether candidates were suitable for the surgery." The court also concluded disputed issues of fact existed as to whether Dr. Cohen negligently measured plaintiff's pupils, and denied summary judgment.

Immediately before trial, Dr. Cohen again moved "in limine" to dismiss plaintiff's informed consent claim. The trial judge denied the motion concluding the motion judge's decision on the issue was the law of the case and also concluded factual questions existed regarding Dr. Cohen's role as a referring physician and, specifically, if he acted in concert with Dr. Stein.

Dr. Cohen also moved in limine to bar Dr. Sulewski from testifying on the standard of care for measuring a patient's pupils prior to lasik eye surgery. After hearing oral arguments, the trial judge concluded that under our holding in Seoung Ouk Cho v. Trinitas Regional Medical Center, 443 N.J. Super. 461, 471-72 (App. Div. 2015), the motion should have been made in accordance with the rules governing motions for summary judgment, and thus was procedurally improper. Despite this procedural deficiency, the court nevertheless scheduled a Rule 104 hearing, see N.J.R.E. 104(a), because the judge "believe[d] that [Dr. Sulewski's] opinion is somewhat shaky, shall I say, in terms of what standard he relies on."

At the Rule 104 hearing, Dr. Sulewski testified that his "training with respect to measuring pupil size" began "during [his] residency and [his] [f]ellowship at [Johns] Hopkins," and that "through the entire evolution of refractive surgery in the early days up until now[,] . . . pupil size is something

that everyone measures before refractive surgery and really what we're trying to determine is [whether] patient[s] [are] going to have problems at night."

Dr. Sulewski further testified "that the standard of care is, prior to refractive surgery, pupil size is measured in . . . relatively dark conditions." He explained that "you gotta be able to see the patient to measure the pupil," so there must be "enough illumination around the eye that you can actually measure the pupil size and that's how it's done." Dr. Sulewski stated that in his opinion, the standard of care is to dim the lights down to "pretty much lights out, very dark," which is "the opinion of what we teach at the University of Pennsylvania," and that he "believe[d] that's what most people do," that his opinion is "shared by others around the country," and "that's the way it is."

When defense counsel questioned Dr. Sulewski about an excerpt from "the WaveLight [m]anual," a manual issued by the manufacturer of the laser that Dr. Stein used to perform the lasik surgery, Dr. Sulewski acknowledged that the manual's precautions section states that pupil size "should be evaluated under mesopic illumination conditions." Dr. Sulewski also testified that "[m]esopic is dim illumination," and that "the term scotopic is dark . . . light conditions," but also that "[s]cotopic is very, very dim, enough that there is light in the room that you can measure the pupils." Thus, he acknowledged that mesopic and scotopic

are "different terms," but stated that "it's a spectrum between the term mesopic and scotopic and depending on how your lanes are set up is how well you can dim the lights and measure the pupils." According to Dr. Sulewski,

> I think that the semantics of dark versus dim is so relative and as I said earlier, you have to have a light on in the room to measure the pupil size or you can't measure it. I mean nobody has dark adaptive eyes that they can see in the dark and if someone has a very dark iris, it's even harder to see the pupils, so you might need a little bit more light. So I think what we as practitioners do, we do the best that we can to dim the lights down to a point that we can still measure the pupil and I'd say that's the standard of care in practice not to just throw on one light and say all right, here's my -- here's my dim light measurement. We are not trying to make the pupil as small as we can so we can do the procedure, it's quite the opposite.

Dr. Sulewski further testified that the WaveLight manual is a "guideline" and does not establish the standard of care, and reiterated that "everybody tries to measure the pupils in dark conditions." The trial judge ruled Dr. Sulewski's testimony was admissible because he "based his opinion on what he was taught, how he practiced, how his colleagues teach[,] and how he teaches," and found that although he was "somewhat equivocal" about the basis for his opinion, that issue went to "the weight . . . and credibility of his testimony." Accordingly, the court denied Dr. Cohen's motion on the merits, and concluded that Dr. Sulewski's proffered expert testimony was admissible.

10

Dr. Sulewski's trial testimony largely echoed his testimony during the Rule 104 hearing. Specifically, Dr. Sulewski testified that pupil size is important when evaluating a patient's candidacy for lasik surgery, and plaintiff's night vision complications were related to plaintiff's pupil size. On this point, Dr. Sulewski highlighted that according to plaintiff's medical records from Campus, plaintiff's right and left pupils were measured at 7.83 and 8.07 millimeters, respectively in scotopic light. Dr. Sulewski described photopic light conditions as "with lights on," and scotopic as "very, very dim." Mesopic lighting was described as "dim illumination."

The reason pupil measurement should be taken under dim illumination is to simulate the "worst case scenario . . . when patients are out at night" and to "screen out patients that have really large pupils because that is a risk factor for developing unwanted side effects . . . ." As to the distinction between scotopic and mesopic measurements, Dr. Sulewski testified:

> [A]lways since the beginning of time, we measure pupils with the lights very, very dim in the room and some people may call . . . that scotopic and some may call it mesopic[;] I don't want the jury to get tangled up in that terminology because . . . they're used sort of interchangeably in practice.

Dr. Bernard Spier, also an expert in ophthalmology, testified on behalf of Dr. Cohen. He stated that the "particular topographer" used in this case, the

11

Zeiss Topographer, "can . . . measure the size of the pupil . . . ." However, he testified that the measurements obtained from the Zeiss Topographer were "invalid" because the pupil had been dilated with eye drops prior to the measurements.

Dr. Spier stated "the standard of care in measuring . . . a patient's pupil size for lasik surgery . . . is to measure the pupil size in what is called mesopic light, which is the normal . . . or lay term" for "dim light" and is "in between . . . dark, which is called scotopic," and "bright light, which is photopic like on a sunny day . . . ." He further stated that "the best simulation of vision in the evening around dusk is simulated by a mesopic light condition," but agreed that "tr[ying] to get the light as low as possible but still be[ing] able to . . . make the measurement" is "an appropriate way to measure the pupil."

Dr. Cohen similarly testified that "you want it as dark as you can [while] still be[ing] able to measure the pupil," but stated, in contradiction to Dr. Sulewski's testimony, that "[t]he standard of care is to measure under dim illumination, or mesopic conditions[,] and there [are] no interchangeable terms. Mesopic is dim, scotopic is dark, photopic is bright lights." Dr. Cohen described the ideal examination room as "essentially as dark as possible, as dim as

possible, with some transient illumination around you." When asked if he told plaintiff "he was a good candidate for lasik surgery," Dr. Cohen stated:

> From my measurements, I know -- keep in mind, I don't determine candidacy, surgeons determine candidacy. I take the measurements for the surgeons, I'm familiar with the procedure, I am a doctor, I know about this procedure so I will give him information. I will tell him if I found anything abnormal that would make him not a good candidate. From all my measurements, everything looked good for him to proceed to see . . . Dr. Stein.

At the close of plaintiff's case, Dr. Cohen moved for an involuntary dismissal under Rule 4:37-2(b), which the court denied. The jury subsequently returned a special verdict in plaintiff's favor in which it unanimously determined that: 1) Dr. Cohen negligently measured plaintiff's pupil size; 2) Drs. Stein and Cohen acted in concert in determining that plaintiff was a good candidate for Lasik; 3) plaintiff did not receive informed consent to undergo the procedure and the undisclosed risk caused him harm; 4) a reasonably prudent person would not have consented to the surgery had they been informed of the risk; and 5) plaintiff's large pupil size proximately caused his injury.

The jury's verdict also awarded plaintiff $3,500 in medical expenses and $480,000 in non-economic losses, for a total award of $483,500. The court

entered judgment in accordance with the jury's verdict, and included prejudgment interest, attorney's fees, and costs. This appeal followed.

On appeal, Dr. Cohen raises three primary arguments. First, he claims that the trial court committed error in denying his motion to dismiss. Second, Dr. Cohen argues the trial court incorrectly denied his motion in limine to bar Dr. Sulewski's expert testimony, misapplied our holding in Cho, and erred in granting a Rule 104 hearing. Finally, Dr. Cohen maintains the trial court committed reversible error in denying his motion for an involuntary dismissal. We disagree with all of Dr. Cohen's arguments.

## II.

In his first point of error, Dr. Cohen argues that he did not have a legal duty to obtain plaintiff's informed consent to undergo lasik surgery, and that it was reversible error for the trial court to apply the law of the case doctrine. Although we agree with defendant that the trial judge incorrectly relied on the motion judge's decision as the law of the case, the trial judge nevertheless reached the correct substantive result when she recognized that to the extent Dr. Cohen acted in concert with Dr. Stein, Dr. Cohen had a duty to obtain plaintiff's informed consent.

14

The law of the case doctrine does not apply to orders denying summary judgment. See Gonzalez v. Ideal Tile Importing Co., 371 N.J. Super. 349, 356 (App. Div. 2004) ("[A]n order denying summary judgment is not subject to the law of the case doctrine because it decides nothing and merely reserves issues for future disposition."); Schuhalter v. Salerno, 279 N.J. Super. 504, 508 n.1 (App. Div. 1995) ("The judge need not and should not have treated the prior denial of partial summary judgment as establishing the law of the case."). Here, the motion judge's interlocutory order merely denied defendant's motion for summary judgment, and was not dispositive to subsequent applications prior to final judgment.

Any reliance on the law of the case doctrine by the trial court in denying Dr. Cohen's renewed motion to dismiss plaintiff's informed consent claim was harmless, however. The motion judge also correctly concluded that subject to the resolution of disputed factual issues, Dr. Cohen had a duty to plaintiff. "It is now settled that a physician has a legal duty to disclose to the patient all medical information that a reasonably prudent patient would find material before deciding whether to undergo a medical procedure." Acuna v. Turkish, 192 N.J. 399, 415 (2007) (citing Largey v. Rothman, 110 N.J. 204, 211-12 (1988)). While the existence of such a duty is a question of law, a "legal determination

of the existence of a duty may differ" based on specific factual issues in the case. Cheng Lin Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991).

That duty, however, generally is not imposed on a physician who merely refers a patient to another doctor. Herrara, 277 N.J. Super. at 268-70. Rather, the duty of a referring physician, who does not act "in concert" or in "an agency relationship" with the operating physician, is to not act negligently in making the referral. Id. at 267-69; accord Sprinkle v. Lemley, 414 P.2d 797, 800 (Or. 1966) ("A general practitioner or family physician who calls in a specialist to treat or perform surgery on a patient is not liable for the negligence of the specialist if there is no concert of action.").

But when physicians have an agency relationship or act in concert with respect to a patient, both physicians have a duty to obtain the patient's informed consent to proceed with treatment. See Herrara, 277 N.J. Super. at 267 (citing Stovall v. Harms, 522 P.2d 353 (Kan. 1974)); accord O'Grady v. Wickman, 213 So.2d 321, 325-26 (Fla. Dist. Ct. App. 1968) (explaining that "many courts . . . have held that one physician is a joint tortfeasor with the other and is liable for his actions when there is a concert of action and a common purpose existing between the two doctors").

16

"Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result." Restatement (Second) of Torts § 876, cmt. a (1979). Here, the record firmly supports the jury's finding that Drs. Cohen and Stein acted in concert toward a common goal of determining whether plaintiff was a good candidate for lasik surgery. Dr. Stein testified that he has "worked with Dr. Cohen" in lasik procedures for at least twenty years. And, Dr. Cohen testified that he "collect[s] the data for" Dr. Stein through pre-operative measurements and provides that data to Dr. Stein prior to surgery. Further, Dr. Cohen admitted that he would have told plaintiff "if [he] found anything abnormal that would make [plaintiff] not a good candidate" for the lasik surgery that was ultimately performed by Dr. Stein.

Although Dr. Stein denied that pupil size was relevant, the jury was free to evaluate his credibility, the scope of his two-decade professional relationship with Dr. Cohen, and plaintiff's testimony that he would not have proceeded with the surgery had he been informed that his pupil sizes were larger than seven millimeters. Thus, unlike in Herrara, the record failed to establish that Dr. Cohen was merely a referring physician to whom the duty to obtain informed consent does not apply. See Herrara, 277 N.J. Super. at 269-70.

Further, "[w]hether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Goldberg v. Hous. Auth. of City of Newark, 38 N.J. 578, 583 (1962) (emphasis omitted); see also Podias v. Mairs, 394 N.J. Super. 338, 355 (App. Div. 2007) ("[T]he question of duty remains one of judicial balancing of the mix of factors peculiar to each case."); Kelly v. Gwinnell, 96 N.J. 538, 544 (1984) ("[R]ealistically," the issue "whether a duty exists" amounts to "whether this Court should impose such a duty.").

Here, the parties' relationship establishes that Dr. Cohen examined and measured plaintiff's eyes before plaintiff consented to Dr. Stein performing surgery. Dr. Cohen testified that if he "found anything abnormal that would make [plaintiff] not a good candidate," he would have so informed plaintiff. In addition, Dr. Cohen provided the data he collected to Dr. Stein, as part of the protocol for lasik eye surgery during the doctors' twenty-plus year working relationship. Those facts weigh in favor of imposing a duty on Dr. Cohen to obtain plaintiff's informed consent and make this case factually dissimilar from Herrara. See Herrara, 277 N.J. Super. at 269-70.

In addition, the nature of the risk involved in an optometrist's failure to inform a patient of his or her large pupils is that a patient, like plaintiff here,

18

will unwittingly expose him or herself to a greater chance of suffering long-term vision problems.  In this regard, Dr. Cohen conceded that the disclosed risks in the consent form "would be meaningless" to a person who was unaware that he or she had large pupils, and because Dr. Cohen had "the opportunity and ability to exercise care" to mitigate the increased risk, imposing the duty would be fair and equitable.  Robinson v. Vivirito, 217 N.J. 199, 213 (2014).

Finally, the public interest in the proposed solution also supports the imposition of a duty because requiring pre-operative optometrists who act in concert with a surgeon, as the jury concluded Dr. Cohen did here, to obtain their patient's informed consent would have no readily discernible adverse effects on the public who would be better protected against unknowingly exposing themselves to increased risks of long-term vision problems.

## III.

As noted, on the eve of trial, Dr. Cohen filed what he characterized as a "motion in limine to bar certain testimony of plaintiff's liability expert." According to defendant, a favorable ruling on that motion "would not have resulted in the dismissal of plaintiff's case," but "would only have barred testimony by Dr. Sulewski regarding his personal opinions as to measurement of pupil size," and thus did not fall within the purview of Cho.  We agree with

19

the trial judge that plaintiff's motion violated the due process concerns we expressed in Cho.

In Cho, we explained that "whether a motion is correctly termed a motion in limine is not dictated by the fact it is brought literally on the threshold of trial." Cho, 443 N.J. Super. at 470. Rather, "[w]hen granting a motion will result in the dismissal of a plaintiff's case or the suppression of a defendant's defenses, the motion is subject to Rule 4:46, the rule that governs summary judgment motions." Id. at 471.

Here, the trial court correctly concluded that granting defendant's motion would amount to a dismissal of plaintiff's case. Indeed, Dr. Sulewski's expert testimony on the standard of care served as plaintiff's affirmative proof of: 1) the standard of care for measuring pupil size prior to lasik eye surgery; 2) Dr. Cohen's deviation from that standard of care; and 3) the causal relationship between Dr. Cohen's failure to inform plaintiff that he, in fact, had large pupils and plaintiff's damages.

Without Dr. Sulewski's testimony, plaintiff could not have established that Dr. Cohen negligently measured plaintiff's pupil size. If Dr. Cohen measured plaintiff's pupil size at 6.5 millimeters pursuant to the applicable standard of care proposed by Dr. Spier, then defendant was not, in fact, at a heightened risk

for developing the disclosed night vision complications of lasik eye surgery. Accordingly, barring Dr. Sulewski's testimony as to the standard of care would have defeated plaintiff's claim that Dr. Cohen negligently measured his pupils, as well as plaintiff's related claim that Dr. Cohen breached a duty by failing to inform plaintiff that he had large pupils. Therefore, a ruling in defendant's favor on the motion would have effectively resulted in a dismissal of plaintiff's complaint. Thus, the trial court correctly concluded the motion was procedurally improper under Cho.

However, even if we were to assume that Dr. Cohen's motion was not procedurally defective, any error by the trial judge by relying on Cho was inconsequential as the court addressed the merits of the motion and subsequently held a Rule 104 hearing. And, contrary to Dr. Cohen's claim, the court did not abuse its discretion in deciding to conduct that hearing.

"An abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cnty. Prosec., 171 N.J. 561, 571 (2002)); see also Kemp ex rel. Wright v. State, 174 N.J. 412, 428 (2002) (stating that whether to hold a Rule 104 hearing "when the ruling on admissibility" of expert

21

testimony "turns on factual issues" is a question that "rests in the sound discretion of the [trial] court") (quoting Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999)).

In deciding to hold a Rule 104 hearing, the court concluded:

> There are several passages [of Dr. Sulewski's deposition testimony] that are referred to in terms of whether or not Dr. Sulewski was testifying about a standard of care that's accepted by the general medical community as far as the pupil measurement issue. Some of his testimony says this is my personal opinion, this is my personal opinion and yes, it's a little shaky about what he bases it on, his group and his history but at the end of the day, I can't outright dismiss it at this point in time without a 104 [h]earing regarding the net opinion issue.

The parties only included an excerpt of Dr. Sulewski's deposition testimony in the record on appeal. Our review of that limited testimony, however, convinces us that the court properly exercised its discretion in conducting a Rule 104 hearing.

Indeed, while Dr. Sulewski certainly offered opinions in his deposition that, in isolation, indicate he was offering only his personal opinion and not that of the broader medical community, he also testified at that deposition that his opinion was consistent with a generally accepted standard of care. Indeed, Dr. Sulewski testified that his "standard of care" was based on the "standard of care

22

. . . at the Scheie Institute" at the University of Pennsylvania, "[a]nd everywhere else [he has] been."  Accordingly, and contrary to defendant's claim that plaintiff failed to make a requisite "threshold showing that an arguable issue exists as to the evidence . . . [justifying] . . . a full preliminary hearing under" Rule 104, the record supports the trial judge's decision to hold a Rule 104 hearing to elicit more clearly the factual basis for Dr. Sulewski's proposed testimony.

IV.

Dr. Cohen next argues that Dr. Sulewski's testimony at the Rule 104 hearing and at trial were inadmissible net opinions.  Specifically, he contends that "Dr. Sulewski's opinions were patently insufficient in that they were void of any standard, recognized practice, or treatise, other than the expert's personal view."  According to defendant, "Dr. Sulewski failed to provide the 'why and wherefore' of his opinion and only gives his conclusions as to the applicable standard of care and causation which are completely unsupported."  Again, we disagree.

"[A]n expert's bare opinion that has no support in factual evidence or similar data is a mere net opinion which is not admissible and may not be considered." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011).  This "admissibility rule has been aptly described as requiring that the

23

expert 'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Ibid. (quoting Polzo v. Cnty of Essex, 196 N.J. 569, 583 (2008)). "Similarly, if an expert cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is 'personal,' it fails because it is a mere net opinion." Id. at 373. The trial judge's decision to admit Dr. Sulewski's expert testimony is governed by the abuse of discretion standard on appeal. Pomerantz, 207 N.J. at 371; see also Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010).

In a malpractice action, an expert may properly testify as to the standard of care where the expert possesses "sufficient knowledge of professional standards to justify the expression of an opinion." Carey v. Lovett, 132 N.J. 44, 64 (1993) (citing Sanzari v. Rosenfeld, 34 N.J. 128, 136 (1961)). Where the expert opinion is grounded in "knowledge, skill, experience, training, or education," a court "should allow admission of the testimony." Koseoglu v. Wry, 431 N.J. Super. 140, 159 (App. Div. 2013) (emphasis added) (quoting N.J.R.E. 702). Thus, it is not necessary to show that the expert's opinion derives from a particular medical text or treatise. See Khan v. Singh, 200 N.J. 82, 101 (2009) ("[A]n expert in a malpractice action need not have had personal experience with the situation under investigation to testify to the applicable

standard of care" since the expert's "knowledge may derive from observations of the methods used by members of the profession <u>or</u> from his [or her] study of professional treatises and journals.") (emphasis added) (quoting <u>Sanzari</u>, 34 N.J. at 137).

Here, the trial judge found that Dr. Sulewski based his opinion about the applicable standard of care "on what he was taught, how he practiced, how his colleagues teach[,] and how he teaches," and explained that while he was "somewhat equivocal" about the basis for his opinion, that issue went to "the weight" and "credibility of his testimony." The record supports these findings.

Dr. Sulewski testified that the "standard of care" he teaches in his "various teaching positions" is to use "relatively dark conditions" with "enough illumination around the eye that you can actually measure the pupil size," that his "colleagues" teach the same standard of care, and that he was "trained" as a practitioner to understand that is the standard of care. He stated that he "consult[s] with other ophthalmologists in terms of what they teach," that "everybody tries to measure the pupils in dark lighting conditions," and "[t]hat's what most people that [he] know[s] do." These facts form a legally sufficient basis to support the trial judge's decision to qualify Dr. Sulewski as an expert on

the issue of the standard of care for measuring pupil size prior to lasik eye surgery and for him to present those opinions to the factfinders.

V.

Finally, Dr. Cohen maintains "it was harmful error for the trial court to deny [his] motion for directed verdict on the basis that a jury question existed on th[e] issue of an agency relationship or that the doctors were acting in concert." Dr. Cohen further contends that there was no factual dispute as to what the applicable standard of care was, or that he abided by that standard. We are not persuaded by either of these arguments.

Appellate courts review rulings on "a motion for involuntary dismissal at trial using the same standard as the trial court." Prager v. Joyce Honda, Inc., 447 N.J. Super. 124, 134 (App. Div. 2016) (citing Smith v. Millville Rescue Squad, 225 N.J. 373 (2016)). Under that standard, the motion must "be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37-2(b). "[T]he judicial function here is quite a mechanical one" as the court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5–6 (1969).

As noted, the jury's ultimate decision that Drs. Cohen and Stein acted in concert in determining whether plaintiff was a good candidate for lasik eye surgery was properly supported by the record. As such, there was no error in submitting that question to the jury. Further, because Dr. Sulewski's testimony was competent evidence, the jury properly could have found from his testimony that Dr. Cohen did not measure plaintiff's pupils in accordance with the applicable standard of care by failing to set the illumination in the room to a sufficient dimness or darkness, regardless of the terminology used by Dr. Cohen or the manual provided by the WaveLight laser manufacturer.

Dr. Sulewski's testimony that plaintiff's pupils were measured at eight millimeters in diameter in dimmer or darker illumination was competent evidence that plaintiff was at a heightened risk of experiencing the symptoms disclosed on the consent form, and further establishes negligence by Dr. Cohen in measuring plaintiff's pupils. Coupled with the fact that Dr. Cohen never informed plaintiff that he had large pupils, there was sufficient evidence to establish a causal relationship between plaintiff's damages and Dr. Cohen's measurements and failure to inform plaintiff of the increased risk of symptoms. Defendant's contrary proofs at trial were questions that went to credibility or the

27

weight of the evidence, which is beyond the "judicial function" when deciding a motion for a directed verdict. <u>Dolson</u>, 55 N.J. at 5.

To the extent we have not addressed any of defendant's remaining arguments, it is because we find them without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION